FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

05 SEP -2 PM 4: 19

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

2:05 cv 819

---

ROBERT ROSS, Individually and On
Behalf Of All Others Similarly Situated,
212 E. 39TH STREET
NEW YORK, NY 10016

        *Plaintiff,*

        vs.

ABERCROMBIE & FITCH COMPANY
6301 FITCH PATH
NEW ALBANY, OHIO 43054

    -AND-

MICHAEL S. JEFFRIES
6301 FITCH PATH
NEW ALBANY, OHIO 43054

    -AND-

ROBERT SINGER
6301 FITCH PATH
NEW ALBANY, OHIO 43054

    -AND-

MICHAEL W. KRAMER
6301 FITCH PATH
NEW ALBANY, OHIO 43054

        *Defendants.*

---

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL
SECURITIES LAWS**

**JURY TRIAL DEMANDED**

**JUDGE HOLSCHUH**

**MAGISTRATE JUDGE KEMP**

---

Plaintiff Robert Ross ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his complaint against defendants,

alleges the following based upon personal knowledge as to himself and his own acts, and

information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through his attorneys, which included, among other things, a review of

1

defendant Abercrombie & Fitch Co. ("Abercrombie" or the "Company") public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Abercrombie & Fitch Co. and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal class action on behalf of purchasers of the common stock of Abercrombie between June 2, 2005 and August 16, 2005, inclusive (the "Class Period"). During this time period, Abercrombie was publicly disseminating positive news about its sales at the same time negative information about its financial condition was known to, or recklessly disregarded by Company insiders. Abercrombie's Chairman and Chief Executive Officer sold more than 1.6 million shares of Abercrombie common stock reaping $118 million in profits in July 2005 alone based on negative, material Company information known to him, but unknown to Plaintiff and the Class. Following the revelation of the material, undisclosed information, Abercrombie's common stock price plummeted, resulting in substantial losses to Plaintiff and the Class.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20A of the Exchange Act, (15 U.S.C. §§78j(b), 78t(a) and 78t-1(a), and Rule 10b-5 promulgated thereunder(17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

4. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b). Many of the acts and transactions alleged

herein, including the preparation and dissemination of materially false and misleading information, occurred in a substantial part in this Judicial District. Additionally, the Company maintains its principal executive office in this Judicial District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff Robert Ross, as set forth in the accompanying certification, incorporated by reference herein, purchased Abercrombie common stock during the Class Period at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Abercrombie is a Delaware corporation that maintains its principal executive offices at 6301 Fitch Path, New Albany, Ohio 43054. Its common stock is actively traded on the New York Stock Exchange ("NYSE") under the symbol "ANF". There are over 86 million shares of Abercrombie common stock issued and outstanding. Abercrombie is a specialty retailer of high quality, casual apparel for men, women and children. Abercrombie sells its merchandise through retail stores throughout the United States and through catalogs. The Company also operates three e-commerce websites. Abercrombie has four apparel brands, Abercrombie & Fitch, Abercrombie, Hollister Co. and its newest brand, RUEHL.

8.     Defendant Michael S. Jeffries ("Jeffries") is and was, at all times relevant hereto, the Company's Chairman of the Board since May 1998 and Chief Executive Officer since February 1992. Jeffries has been a Company director since 1996 and serves

3

as a member of the Executive Committee of the Board of Directors. Defendant Jeffries sold in excess of two million shares of Abercrombie common stock during the Class Period, reaping profits of approximately $133 million.

9.     Defendant Robert S. Singer ("Singer) was, until his August 31, 2005 departure, the Company's President and Chief Operating Officer and held these positions since May 2004. Defendant Singer was a Company director from May 2004 through June 2005. He signed the Company's June 2, 2005, July 7, 2005 and August 4, 2005 SEC filings on Forms 8-K. Following the April 15, 2005 resignation of Chief Financial Officer Susan J. Riley, and until August 8, 2005, he assumed the responsibilities of principal financial officer.

10.     Defendant Michael W. Kramer ("Kramer") is the Company's Senior Vice President and Chief Financial Officer, having held these positions since August 8, 2005. Defendant Kramer signed the Company's August 16, 2005 and August 29, 2005 SEC filings on Forms 8-K.

11.     Defendants Jeffries, Singer, and Kramer are collectively referred to hereinafter as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as the top senior executive officers and/or directors of Abercrombie were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or

4

recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the investing public.

12. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Abercrombie, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein and were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

13. As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful

5

information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, or to refrain from trading based on inside information with respect thereto. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14. As a seller of the Company's stock, defendant Jeffries also had a duty to correct any previously issued statements made by defendants that had become materially misleading or untrue, so that the market price of the Company's publicly- traded securities would be based upon truthful and accurate information. He, along with the other Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Abercrombie, each of the Individual Defendants had access to the adverse undisclosed information about Abercrombie's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Abercrombie and its business issued or adopted by the Company materially false and misleading.

15. Each of the defendants is liable as a participant in a course of business that operated as a fraud or deceit on purchasers of Abercrombie securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Abercrombie's business, operations, management and the intrinsic value of Abercrombie's securities; and (ii) caused Plaintiff

6

and other members of the Class to purchase Abercrombie securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Abercrombie between June 2, 2005 and August 16, 2005, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Abercrombie common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Abercrombie or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

7

19.  Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

20.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of Abercrombie; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

21.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS WERE ISSUED BY DEFENDANTS

22.  During its February 15, 2005 Fourth Quarter 2004 Earnings Conference Call ("Earnings Conference Call"), the Company noted that it had adopted a new policy not to provide quarterly guidance to investors. In the Earnings Conference Call, the

8

Company explained that it would, however, provide annual earnings guidance and would

continue to provide monthly sales for its retail chains, including Abercrombie & Fitch

and Hollister Co.

23. With respect to Abercrombie's 2005 annual earnings guidance, the

February 15, 2005 press release further stated that:

> In the current fiscal year, the Company plans to increase gross square-footage by approximately 9% by the end of fiscal 2005 primarily through opening flagship Abercrombie & Fitch stores in New York, Los Angeles and through the addition of approximately 55 new Hollister stores. In addition, the Company plans to convert approximately three Abercrombie & Fitch and five Abercrombie Kids stores into smaller formatted Hollister stores during fiscal 2005, the first of which is planned to open during the first quarter. The Company also expects to open approximately five RUEHL stores.
>
> Assuming net sales growth of approximately 20% in 2005, management expects net income per share on a fully diluted basis for fiscal 2005 to be in the range of $2.80 to $3.00 per diluted share. This does not include the impact on 2005 net income per share resulting from the implementation of Statement of Financial Accounting Standards No. 123R, "Share Based Payments," which will be effective beginning in the third quarter of 2005.

24. On June 2, 2005, the Company reported denim sales separately for the first

time. It said that May denim sales increased 166%. The June 2 denim figures were

received warmly by Wall Street. In its June 2, 2005 Company Note, Piper Jaffray

commented that denim sales were "a reflection of the company's growing denim

mindshare". Thereafter, the share price of Abercrombie's common stock soared upon the

market's reaction to the Company's June 2, 2005 press release discussed below.

25. As later noted by The Wall Street Journal in its August 29, 2005 "Heard

on The Street: Abercrombie Stock Sales Draw Concern," column, this new denim figure

was reported as part of an effort to calm investors' worries after analysts noted a glut of

high-priced denim at stores like Abercrombie.

9

26. The June 2, 2005 reporting of total company denim sales was designed to, and did, operate as guidance to comfort investors resulting in an inflated market for Abercrombie common stock. On June 2, Abercrombie common stock traded amidst an unusually high trading volume at a high of $65.68 per share and closed at $65.00 per share. The $65.00 per share closing price on June 2 was $7.01 higher than the $57.99 closing price of the stock on the previous day. The Company's stock price rose continuously until its high of $73.14 on July 7, 2005.

27. In a press release filed with the SEC in a Form 8-K on July 7, 2005, Abercrombie announced net sales of $221.6 million for the five-week period ended July 2, 2005 which represented a 52% increase over net sales of $146.1 million for the five-week period ended July 3, 2004. Comparable store sales increased 38% over the same period in 2004 and 25% year-to-date. Year-to-date, Abercrombie reported a 39% increase of net sales to $927.4 million from $669.5 million in 2004.

28. June ended on an encouraging note from Defendants, causing Abercrombie's common stock to trade at a high of $74.10 on July 7, $2.89 higher than the previous day's high of $71.21, before closing at a 52-week high of $73.14.

29. While the Company was unabashedly positive in its public statements, the Individual Defendants knew, but failed to reveal that the Company margins - a material indicator of its true financial condition - would be lower than expected in its 2005 second fiscal quarter, as compared to the second quarter of 2004. As Vick Khoboyan, a vice president at hedge fund Willowbrook Asset Management subsequesntly observed, and as reported on August 29, 2005 by The Wall Street Journal: "They didn't give a full picture to investors" when they implied that denim sales were going well because margins were

10

lower than expected. In fact, this bullish report on denim sales served to further buoy investor confidence.

30. That this information was known to top Abercrombie management, including the Individual Defendants, but undisclosed to the investing public is evidenced by the Abercrombie common stock trading of defendant Jeffries. On July 7, defendant Jeffries, knowingly or recklessly disregarding that these positive results were materially false and misleading, began selling significant amounts of Abercrombie shares. By the end of the following week, Jeffries sold more than 1.5 million shares at prices between $70 and $73.80 per share. Jeffries' profits on the sale of 1.5 million shares amounted to approximately $110 million. In the week following his $110 million profit, Jeffries sold an additional 111,100 shares at almost $70 a share for which he profited by an additional $8 million.

31. Jeffries' sales of Abercrombie stock during the period from July 7, 2005 through July 15, 2005 are set forth below:

| DATE OF SALE | PRICE PER SHARE | NUMBER OF SHARES SOLD |
| --- | --- | --- |
| 7/7/05 | $72.40 – $73.80 | 771,082 |
| 7/8/05 | $72.15 – 7$2.97 | 300000 |
| 7/11/05 | $72.00 – $73.48 | 283500 |
| 7/12/05 | $71.50 – $72.15 | 307,164 |
| 7/13/05 | $70.75 – $72.42 | 94,900 |
| 7/14/05 | $70.00 – $71.00 | 124,900 |
| 7/15/05 | $69.75 – $69.91 | 111,100 |

11

32.     In a press release on Form 8-K that Abercrombie filed with the SEC on
August 4, 2005, Abercrombie announced net sales of $191.0 million for the four-week
period ended July 30, 2005 which represented a 33% increase over net sales of $143.7
million for the four-week period ended July 31, 2004. Comparable store sales increased
22% over the same period in 2004. Year-to-date, Abercrombie reported a 38% increase
of net sales to $1.118 billion from $813.3 million in 2004. For the year-to-date period,
comparable store sales increased 24%. No mention was made of the decrease in the
Company's margins.

33.     In a press release filed with the SEC in a Form 8-K on August 16, 2005,
Abercrombie reported record net income of $57.4 million and net income per share on a
fully diluted basis of $0.63 for the Second Quarter ended July 30, 2005("Second
Quarter").

34.     Jeffries was quoted in the press release as stating:

> We achieved extraordinary like for like and total sales growth this quarter.
> This success was driven by our focus on core sportswear categories such
> as denim and knits across all brands and our determination to be the
> leading aspirational casual apparel company in each of our target customer
> age groups. We continue to emphasize the aspirational character of our
> brands by increasing the quality of our product and enhancing the
> environment, presentation and customer experience in our stores. This has
> enabled us to attain significant same store sales increases at the same time
> that we have eliminated sales promotions and realized double digit
> increases in average unit prices in Abercrombie & Fitch and abercrombie.
> We believe that the strategies we have put into place will enable us to
> continue to grow both our sales and profits in the coming months and
> years.

35.     With respect to Abercrombie's 2005 annual earnings guidance, the August

16, 2005 press release further stated that:

> Based on a sales plan of approximately $2.7 billion for fiscal 2005, the
> company expects net income per share on a fully-diluted basis to be in the
> range of $3.10 to $3.30, an increase from its previously issued guidance of

12

$2.80 to $3.00 per diluted share for fiscal 2005.

> The Company now expects total capital expenditures for fiscal 2005 to be between $265 million and $285 million. The majority of the expenditures are related to new store construction, remodels, and home office investments. These amounts do not reflect construction allowances which are recorded on the balance sheet as a deferred credit as opposed to a reduction in capital spending.

36.    While the Company increased its earnings guidance on August 16, 2005, stock price reacted negatively, undoubtedly because the price of Abercrombie shares fell $2.54 to $61 per share by the close of the market on August 16, 2005 and to $55.75 per share by 4:42 p.m. It had traded at a high of $64.95 on August 15. The stock traded on an unusually high volume on August 172, 2005 with a high of only $59.03 and closed at $58.85, down $4.70 from the $63.55 closing price on August 15, 2005. That decrease was a result of the decrease in Company margins (from 70% in the 2004 second quarter to 68.% in the 2005 second quarter, below street expectations for incremental improvement and a 180 basis point decline), seen as a key financial indicator, as well as the fact that the Company had, at $.63 per share, in the market's view, well missed the consensus estimate for the quarter of $.69 per share, an estimated based on and fueled by Defendants' prior statements concerning the monthly results and Second Quarter estimate, as well as denim sales. Analysts also expressed concerns over inventories that were up over 67% per foot driven by a significant increase in denim, and the Company's highest level since 1999. This could, in their view, lead to significant markdowns which would negatively affect Company profits.

37.    On August 18, 2005, Jeffries sold an additional 100,000 shares at prices between $58.46 and $58.45 for a profit of approximately $3.5 million, reportedly resuming his pre-July 2005 trading pattern. As a result of Jeffries' sales prior to the rapid decline of Abercrombie's stock price, he avoided approximately $22 million of paper

13

losses by selling 1.62 million shares in July alone. Those sales resulted from exercising about 1.8 million stock options with strike prices of $8 and 23.41 per share. In 2005, Jeffries sold about 2 million shares, netting approximately $133 million, compared to sales of about 600,000 shares in 2004, 950,000 shares in 2003 and 50,000 shares in 2002. Needless to say, Jeffries July 2005 sales are unusual in both timing and amount. His weekly sales have averaged about 100,000 shares and he has not sold more than 250,000 shares in any week in the past nine years. Jeffries reportedly now owns 339,000 and holds approximately 7.5 million stock options, though not all of them are exercisable. Mark Lo Presti, senior quantitative analyst at Thompson Financial, was quoted in the financial press on August 29, 2005 as describing Jeffries' selling as "substantial", noting that "The stock has risen for about a year but his selling wasn't very heavy" until this summer.

38.     In a press release filed with the SEC in a Form 8-K on August 29, 2005, Abercrombie announced the departure of defendant Singer, President and Chief Operating Officer, effective August 31, 2005, citing a "difference in approach" over the Company international expansion plans. This was the second departure of a top Company executive in four months. Abercrombies's Chief Financial Officer left in April 2005.

39.     In light of Jeffries' insider purchases, there can be no doubt that he, together with the Individual Defendants who received a material amount of their compensation in Company stock options, possessed substantial motives and ample opportunity to engage in the fraudulent conduct alleged herein. As set forth above, defendant Jeffries, who had access to material inside information about the status of Abercrombie's Second Quarter performance, was benefiting from the illegal course of

14

conduct described in this Complaint by selling the Company's common stock at artificially inflated prices, without publicly disclosing the material facts about the Company to which he was privy.

40. Thus, Jeffries sold Abercrombie stock at inflated prices, knowing or recklessly disregarding the fact that the Second Quarter results would result in a depression of the value of Abercrombie shares and that he would profit therefrom, while Plaintiff and the Class, unaware of the material information described herein, were purchasing shares at those same inflated prices.

41. The statements relating to the Company's financial condition set forth above were materially false and misleading when made, in violation of Section 10(b) and Rule 10b-5, because the Company misled investors by touting sales, particularly denim sales, while failing to reveal its margin issues. As alleged above, these statements were materially false and misleading because they failed to disclose and/or misrepresented adverse facts which were known to Defendants. In fact, while the Company initiated efforts to comfort investors with a "total company denim sales" figure on June 2, 2005, no new figures were provided to alert investors to the fact that the Abercrombie's margins would be lower than expected in comparison to the Second Quarter of 2004.

42. The market for Abercrombie's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Abercrombie's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Abercrombie securities relying upon the integrity of the market price of Abercrombie's securities and market information relating to Abercrombie, and have been damaged thereby.

15

43. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Abercrombie 's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

44. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately the damages sustained by Plaintiff and other members of the Class which resulted from their purchases of Abercrombie stock at artificially inflated prices during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

45. At all relevant times, the market for Abercrombie securities was an efficient market for the following reasons, among others:

(a) Abercrombie stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Abercrombie filed periodic public reports with the SEC and the NYSE;

(c) Abercrombie regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

16

(d)     Abercrombie was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

46.     As a result of the foregoing, the market for Abercrombie securities promptly digested current information regarding Abercrombie from all publicly available sources and reflected such information in Abercrombie stock price. Under these circumstances, all purchasers of Abercrombie securities during the Class Period suffered similar injury through their purchase of Abercrombie securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Abercrombie who knew that those statements were false when made.

17

## FIRST CLAIM

### Violation Of Section 10(b) of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

48. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Abercrombie securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

50. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Abercrombie securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Abercrombie as specified herein.

18

52.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Abercrombie value and performance and continued substantial growth, which included the making of, or the participation in the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Abercrombie and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Abercrombie securities during the Class Period.

53.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

54.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.     Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Abercrombie operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Abercrombie securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Abercrombie publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Abercrombie securities during the Class Period at artificially high prices and were damaged thereby.

56.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had

Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Abercrombie was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Abercrombie securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

58. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

Violation of Section 20(a) of
The Exchange Act Against the Individual Defendants

59. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60. The Individual Defendants acted as controlling persons of Abercrombie within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62. As set forth above, Abercrombie and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation Of Section 20A of
### The Exchange Act Against Defendant Jeffries

63. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

64. This claim is asserted against defendant Jeffries pursuant to Section 20A of the Exchange Act by Plaintiff who purchased Abercrombie common stock contemporaneously with the sales of the Company's common stock by defendant Jeffries.

65. Defendant Jeffries was privy to confidential information concerning the Company as alleged herein. Notwithstanding defendant Jeffries' duty to refrain from

22

trading in Abercrombie common stock unless he disclosed the foregoing material facts, defendant Jeffries sold, in the aggregate, 1.62 million shares of Abercrombie common stock during the Class Period while in possession of material, non-public information, as set forth above.

66. Defendant Jeffries sold his shares of Abercrombie common stock as hereinbefore alleged, at market prices artificially inflated by the non-disclosure of, and/or misrepresentations of, such material facts in the public statements they made or that they caused the Company to make.

67. Defendant Jeffries knew or recklessly disregarded that he was in possession of such material information which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Abercrombie common stock contemporaneously with the sales by defendant Jeffries. Before selling his common stock, defendant Jeffries was obligated to publicly disclose the material information he possessed.

68. By reason of the foregoing, defendant Jeffries, by use of the means or instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of conduct which operated as a fraud or deceit upon Plaintiff and the Class, who purchased shares of Abercrombie common stock contemporaneously with the sales by defendant Jeffries.

69. As a result of Plaintiff's and the Class' purchases of Abercrombie common stock contemporaneously with defendant Jeffries' sales of Abercrombie common stock, Plaintiff and the Class members have suffered recoverable damages. Defendant Jeffries is liable to Plaintiff and the Class as a result of such transactions.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(B)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: $\underline{9 - 2}$ , 2005

MAGUIRE & SCHNEIDER

By: _____

Keith Schneider (0041616)
Trial Counsel
250 Civic Center Drive
Suite 200
Columbus, Ohio 43215
(614) 224-1222

OF COUNSEL:

Mark C. Gardy (MCG-0338)
ABBEY GARDY, LLP
212 East 39th Street
New York, New York 10016
(212) 889-3700

24