IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBERT ROSS, et al.,
    Plaintiffs,

v.

ABERCROMBIE & FITCH
COMPANY, et al.,
    Defendants.

Case No. 2:05-CV-819
(Lead case)
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter is before the Court for consideration of the Defendant's Motion to Dismiss the Amended Complaint. (Doc. #86, 05-819; Doc. #42, 05-848; Doc. #38, 05-879; Doc. #28, 05-893; Doc. #36, 05-913; Doc. #26, 05-959). For the reasons that follow, the motion is denied.

## I.

Plaintiff, Robert Ross, commenced this action on behalf of himself and others similarly situated who purchased the publicly traded securities of Defendant Abercrombie & Fitch Company, ["Abercrombie"], during the period of June 2, 2005 to August 16, 2005, hereinafter referred to as the "class period." Abercrombie, a retailer of "casual luxury" goods and apparel, is headquartered in New Albany, Ohio[1]. In addition to Abercrombie, the Defendants in this

---

[1] Abercrombie sells merchandise throughout the United Stats in retail stores, through catalogs, and on company-owned websites. (*Am. Compl.* at ¶ 41). At the end of fiscal year 2005, Abercrombie operated 851 stores; specifically, 361 Abercrombie & Fitch stores, 318 Hollister stores, 164 abercrombie stores, and 8 RUEHL stores. (*Id.*).

action are: Michael S. Jeffries, Chairman and Chief Executive Officer of Abercrombie; Robert S. Singer, President and Chief Operating Officer of Abercrombie from June 18, 2004 until his resignation on August 31, 2005; David L. Leino, Senior Vice President - Director of Stores of Abercrombie; Diane Chang, Executive Vice President - Sourcing of Abercrombie; and Leslee K. O'Neill, Executive Vice President - Planning and Allocation of Abercrombie. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

The Amended Complaint is brought under the provisions of 15 U.S.C. § 78u-4, which provides for private securities litigation class actions. The Complaint contains three specific causes of action: alleged violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5; alleged violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and alleged insider trading under § 20A of the Exchange Act.

Stated simply, the Amended Complaint alleges that during the class period, Defendants misrepresented Abercrombie's financial performance by reporting very strong sales on a monthly basis from May to July 2005. Plaintiffs claim that the Defendants concealed Abercrombie's gross margin decline and falsely assured the investment community that denim sales were strong and increasing dramatically. According to Plaintiffs, in reality, from May to July 2005, Abercrombie had excess inventories of denim and other products. This allegedly caused Abercrombie to take drastic measures to sell the inventory, which in turn reduced the company's gross margins. Plaintiffs claim that, during the class period, Abercrombie stock traded at artificially high levels based on the allegedly false information provided to the investment community. During this time, the individual Defendants sold 1.9 million of their own shares for a profit of $137 million. On August 16, 2005, Defendants reported that Abercrombie's gross

margin declined 180 points in the second quarter of fiscal year 2005 from the second quarter of

fiscal year 2004. Abercrombie's stock price fell to $56.65 from a class period high of $74.10.

(*Am. Compl.* at ¶ 2). On January 5, 2006, the United States Securities and Exchange

Commission commenced an investigation concerning the sale of stock by Defendants during the

class period.

The Amended Complaint contains specific factual allegations with respect to the

foregoing events. The Court considers these allegations in greater detail below, in the context of

resolving the Defendants' Motion to Dismiss.

## II.

Federal Rule of Civil Procedure 12(b)(6) permits a Defendant, or in this case a Third-

Party Defendant, by motion, to raise the defense of a Plaintiff's "failure to state a claim upon

which relief can be granted." A motion to dismiss for failure to state a claim pursuant to Federal

Rule 12(b)(6) "should not be granted unless it appears beyond a reasonable doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley

v. Gibson*, 355 U.S. 42, 45-46 (1957). The Court is authorized to grant a motion to dismiss under

12(b)(6) only where it is "clear that no relief can be granted under any set of facts that could be

proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). All

well-pleaded allegations must be taken as true and be construed most favorably toward the non-

movant. *See Schuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Mayer v. Mylod*, 988 F.2d 635, 637

(6th Cir. 1993). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a

complaint's factual allegations, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990), the

court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless there is no law to support the claims made, the facts alleged are insufficient to state a claim, or there is an insurmountable bar on the face of the complaint.

## III.

### A.  Section 10(b) and Rule 10b-5 Claims.

The Defendants' Motion to Dismiss the Amended Complaint first contends that Plaintiffs have failed to satisfy the pleading requirements for claims under § 10(b) of the Exchange Act as well as Rule 10b-5.

Section 10(b) of the Securities and Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 makes the following unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary tin order to make the statements made . . . not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Sixth Circuit holds that, in order to state a claim under § 10(b) and Rule 10b-5, the

4

Plaintiff "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Hoffman v. Comshare, Inc.*(*In re Comshare, Inc. Sec. Litig.*), 183 F.3d 542, 548 (6th Cir. 1999).

In enacting the Private Securities Litigation Reform Act of 1995, Congress set forth a uniform pleading standard for § 10(b) actions. The act provides as follows with respect to scienter:

> (b) Requirements for securities fraud actions
>
> (1) Misleading statements and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> **(A)** made an untrue statement of a material fact; or
>
> **(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) Required state of mind
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1), (2) (emphasis added).

### 1. Scienter Requirement

The United States Supreme Court addressed this pleading standard in the recent case of *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, – U.S. –, 127 S. Ct. 2499 (2007). "Our task is to

prescribe a workable construction of the 'strong inference' standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Id.* at 2509. The Court addressed a circuit split as to the appropriate pleading standard. In *Tellabs*, the Seventh Circuit held that a complaint could survive a motion to dismiss if it alleged facts from which, if true, "a reasonable person could infer that the defendant acted with the required intent . . . . If a reasonable person could not draw such an inference from the alleged facts, the defendants are entitled to dismissal." *Id.* at 2506, quoting 437 F.3d at 602. The Seventh Circuit rejected the standard used by the Sixth Circuit, which held that Plaintiffs are entitled only to the most plausible of competing inferences. *See Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004).

The Supreme Court first observed that, in considering a Rule 12(b)(6) motion to dismiss a § 10(b) claim, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509, citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993). Second, courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* In this regard, the inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (citations omitted). Third, the Supreme Court held that in determining whether the complaint alleges facts giving rise to a strong inference of scienter, "the court must take into account plausible opposing inferences."

6

*Id.*

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences," *Fidel*, 392 F.3d at 227 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6ᵗʰ Cir. 2001)(*en banc*)). . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 2510. The Supreme Court stressed that "the court's job is not to scrutinize each allegation in insolation but to assess all the allegations holistically." *Id.* at 2511. "[T]he reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.*

As in the case at bar, the Plaintiffs in *Tellabs* alleged that the company's executives engaged in a scheme to deceive the investing public about the true value of Tellabs' stock. The Supreme Court did not decide whether the Plaintiffs' allegations satisfied the pleading standard under the PSLRA, but vacated the Seventh Circuit's decision for reexamination in light of the Supreme Court's decision.

The briefing in the case at bar was completed prior to the *Tellabs* decision. The parties have addressed the decision in connection with a filing of supplemental authority. Plaintiffs maintain that the their allegations, considered in their entirety, raise an inference of scienter at least as compelling as any opposing inference. The Defendants disagree and maintain that the

7

Amended Complaint fails to satisfy the scienter element.

### Plaintiffs' Allegations

The Court first sets forth the allegations contained in the Plaintiffs' Amended Complaint. Plaintiffs allege that, in the months leading up to the class period, the Defendants promoted Abercrombie's business strategy of maintaining higher product margins by "focus[ing] on increasing the sales dollars per transaction versus increasing the number of customer transactions." (*Am. Compl.* at 43). Thus, Abercrombie was focused on maintaining higher gross margins[2] on its store items. The following pages describe the allegations set forth in the Plaintiff's Amended Complaint.

Plaintiffs allege that, on February 15, 2005, Defendant Jeffries participated in an investor conference call reporting the fourth quarter fiscal year 2004 financial results. Defendant Singer, as well as Thoms Lennox (Director of Investor Relations) and Susan Riley (former CFO), also participated. Jeffries stated:

> We will not be promotional businesses. We will clear on an ongoing basis. There will be 2 larger sales each year, one the day after Christmas, and one the day after Father's day or the day before Father's day, but there will be constant clearing in terms of the end of a style, just marked down and put to the back of the store.
>
> This is a really critical strategy for us to separate ourselves from the competition, to have better-looking stores, and to train a customer to buy goods at regular price . . . .

(*Id.* at ¶ 45).

---

[2] A gross margin is simply the difference between revenue and the cost of goods sold. Plaintiffs observe that "[g]ross margin is a very important business indicator as it demonstrates how profitable a company is at its most fundamental level, which in turn impacts its earnings." (*Am. Compl.* at ¶ 44).

On March 17, 2005, Singer spoke at a Banc of America Securities Consumer Conference, stating:

> We have adopted a policy to be absolutely non-promotional in our stores. We put our best merchandise front and forward and we have eliminated basically all promotions from our stores and this absolutely distinguishes us from most of the competitors operating in the American mall environment right now. . . .
>
> [B]y being much less promotional we've had fewer markdowns and, therefore, we were able to achieve a better maintain margin, and finally with the level of growth of sales we actually, also, had leverage on our occupancy costs. . . .
>
> [I]t's absolutely critical, we can charge a higher price, but we have to give a greater value. And the customer has to be able to perceive that value. It's absolutely essential.

(*Id.* at ¶ 46).

Plaintiffs allege that, by October 2004, Abercrombie's comparable store sales[3] began to increase. (*Id.* at ¶ 48). From 2000 to September 2004, Abercrombie had reported negative or nominal comparable store sales for 57 consecutive months. By October 2004, comparable store sales increased 11%. (*Id.*). "As a result, Abercrombie's share price, which had traded in the $20 to $30 range before October 2004, began to steadily increase into the $40 range in November and December of 2004. In January 2005, the stock price climbed into the $50 range." (*Id.*).

In February 2005, Defendants announced that Abercrombie was increasing denim inventories because it was a "popular, well-performing product line." (*Id.* at ¶ 49). According to Plaintiffs, investors were worried that other aspects of Abercrombie's business would suffer, "namely its profitability as reflected by high gross margins." (*Id.*). "Defendants reassured

---

[3]Comparable store sales measure top-line sales growth at stores that have been open for over a year. (*Id.* at ¶ 47). According to Plaintiffs, comparable store sales are "important to investors as it demonstrates how well a company is increasing (or decreasing) sales in a given period from a year before." (*Id.*).

investors that Abercrombie's strategy for maintaining high gross margins was intact and would continue well into 2005, and that increasing the company's denim inventories posed no risk to profitability." (*Id.*).

Plaintiffs allege that, in March or April 2005, Defendant Jeffries hosted a meeting at Abercrombie's headquarters to discuss the plan to increase denim inventory. Plaintiffs claim that many high-ranking employees expressed concern about the strategy. In particular, they feared that an "incremental build-up of inventory at the retail stores would result and that this inventory would exceed the market demand for denim products. Distribution Center managers attending the meeting also expressed concern that the Distribution Center did not have the capacity to handle such an excessive amount of increased inventory." (*Id.* at ¶ 50). According to Plaintiffs, Defendant Jeffries summarily dismissed these concerns and said "just go with it." (*Id.*). On April 13, 2005, CFO Susan Riley "abruptly quit without a successor." (*Id.* at ¶ 51).

On May 17, 2005, Jeffries, Singer and Lennox hosted an investor conference call to report the first quarter fiscal year 2005 financial results. Abercrombie reported earnings per share [EPS] of $0.45 and a gross margin of 63.5%, which was an increase of 30 base points from the first quarter of fiscal year 2004. (*Am. Compl.* at ¶ 52). During the conference, Singer stated:

> A key driver of our increased sales was the significant increase in average unit retail of 23% over last year's first quarter. This increase derived from the ever higher quality level of our product and the elimination of promotional activity, **as well as increased unit sales of higher priced items, in particular denim**.
>
> *        *        *
>
> I think that basically what you see is that **we have more transactions in product with higher unit prices, particularly in the denim**. And the other thing is that, I think, by having the **lower promotional expense, we have more sales dollars for fewer transactions**. So I don't – and we're not concerned about – all the businesses have shown remarkable growth, and that's in dollars that we're doing and **I think that's what we're totally focused on, the dollars rather than the**

10

**number of transactions**.  The traffic in the stores has continued to be extraordinary, and I don't think we're concerned at all.

(*Id.*) (emphasis in original).    Jeffries stated the following during the conference:

> In our stores we have improved service presentation standards, and by **eliminating promotion activity**, we have both enhanced our brand's image as the premium casual brand in each target age category while also **improving sales margins.  These characteristics clearly differentiate us from the competition**.
>
> *            *            *
>
> Results at Abercrombie & Fitch were truly outstanding as we generated exceptional growth, notwithstanding our relatively constant store count.  Net sales for the quarter exceeded 300 million, with comp store sales increasing 16%.  I believe this is an amazing accomplishment given the size, maturity, and historical margin structure of this business.  **It is particularly extraordinary given that we have achieved this growth by moving completely away from any promotional activity** . . . . We continue to seek improved quality and fashion **while maintaining our high gross margins**.

(*Id.*) (emphasis in original).

At the end of the first quarter of fiscal year 2005, Abercrombie's inventory was up 56% on a per square foot basis from the first quarter of fiscal year 2004.  (*Id.* at ¶ 53).  Plaintiffs allege that analysts were concerned that Abercrombie would have to mark down its inventory, which would put gross profit margins and earnings at risk.  (*Id.*).  Plaintiffs claim that Defendants again "reassured investors that the majority of the inventory increase was in basic items, *i.e.*, denim, Abercrombie's leading clothing line, which did not carry markdown risks and would not impact the profitability and gross margins of the Company."  (*Id.* at ¶ 54).

During a May 17, 2005 conference call, Jeffries stated:

> That is a significant increase in inventory.  But, we're making a significant increase in inventory in what we would classify as non-risk classifications.  We are continuing to be very conservative in our fashion classifications which carry markdown risks. . . .

(*Id.*).

11

Following these comments, on May 18, 2005, Barbara Wyckoff and Jim Chartier, analysts with Buckingham Research Group, issued a report stating that "[Abercrombie's] inventory is clean and current and we expect that its markdowns will continue to be below last year, driving strong margins at regular price through 2nd quarter." (*Id.* at ¶ 55). On May 20, 2005, Stacy Pak, an analyst with Prudential Equity Group, LLC, issued a report predicting an excess of denim in the retail industry, including at Abercrombie. (*Id.* at ¶ 56). The report stated: "We recently learned from our sources that [Abercrombie] has been trying to cancel denim orders with their vendors. [Abercrombie] confirmed that the company has in fact 'looked to have some deliveries pushed off to future periods.'" (*Id.*). Defendants allegedly responded by denying waning sales and stating that the inventory increase was "just a question of timing; management views the inventory as basics that will not be subject to markdown risk." (*Id.* at ¶ 57).

On June 2, 2005, during the class period alleged by Plaintiffs, Abercrombie issued a press release entitled: "Abercrombie & Fitch Reports May Sales Increase of 43%; Comparable Store Sales Increase 29%." The release stated, in part:

> Abercrombie & Fitch Co. today reported net sales of $159.0 million for the four-week period ended May 28, 2005, a 43% increase over last year's net sales of $111.5 million for the four-week period ended May 29, 2004. May comparable store sales increased 29% over the same period last year.
>
> Year-to-date, the Company reported a net sales increase of 35% to $705.8 million from $523.4 million last year. Comparable store sales increased 21% for the year-to-date period.
>
> MAY 2005 HIGHLIGHTS
>     Total Company net sales increased 43%
>     Total Company comparable store sales increased 29%
>     Abercrombie & Fitch comparable store sales increased 28%
>     Hollister Co. comparable store sales increased 48%
>     abercrombie comparable store sales increased 48%

**Total Company denim sales increased 166%**

(*Id.* at ¶ 59) (emphasis in original). Plaintiffs allege that Defendants had never before reported

specific percentages on denim sales but did so "to negate the validity of Pak's report that denim

sales were suffering and to assure investors that denim sales were ramping up to match increased

inventory levels." (*Id.* at ¶ 60). The foregoing press release was followed by a sales conference

call during which an Abercrombie representative stated:

> Year-to-date sales were $705.8 million versus $523.4 million last year, an
> increase of 35%. Comparable store sales increased 21% for the year-to-date
> period compared to last year. May's sales reflected continuation of strong
> comparable store increases in each of our businesses. Comps increased by 25% on
> a month to date basis through the third week of May before increasing by the low
> 40's in the fourth week of May with implementation of our summer clearance
> event. **Summer clearance, which began during the final week of May versus
> the second week of June last year, was planned earlier to prepare for an
> expanded preview of our back to school assortment.** We are scheduled to fully
> implement the back to school assortment during the fifth week of June, which is
> similar in timing to last year.

(*Id.* at ¶ 61) (emphasis in original).

After the foregoing reports, Abercrombie's share price increased 11% from $57.99 on

June 1 to $65.00 on June 2, 2005. Plaintiffs claim that Defendant Singer immediately sold

37,500 shares at an average of $62.00 per share for $2.3 million. (*Id.* at ¶ 62). Defendant Jeffries

sold 150,000 shares at prices of $64.53 to $67.66 per share between June 2 and 14, 2005 for $10

million in proceeds. (*Id.*). Defendants Leino, Chang and O'Neill also sold shares during this

time period for proceeds of over $7 million. (*Id.*).

On June 2, 2005, five analysts made reports regarding Abercrombie. Joseph Teklits, of

Wachovia Securities, issued a report rasing the second quarter fiscal year 2005 EPS estimates

and stating: "A&F up 28%, Hollister up 24%, and Abercrombie kids up 48%. All had sales

driven by significant traffic and average unit value increases, and all cleared out denim." (*Id.* at ¶ 64). Mitch Kummetz, of D.A. Davidson & Co., issued a report estimating a second quarter gross margin of over 70%. (*Id.* at ¶ 65). Liz Pearce, of Sanders Morris Harris, issued a report entitled: "ANF[4]: Stellar May Comps; Raising Price Target." As to denim sales, Pearce stated:

> May proved to be an exceptional month for all divisions. **We believe the strength in denim, which was up 166%, suggests that the company is not going to be the victim of a denim glut,** as the ANF concepts continue to update and differentiate their styles of denim. **The strength in denim sales reinforces our belief that customers have an appetite for denim as long as it is new and differentiated. We therefore continue to believe that denim sales will remain strong for all ANF concepts,** as they continue to be ahead of the curve in terms of product differentiation via embellishment, in particular, via embroidery and the level of product destruction. We further believe that Abercrombie & Fitch and Hollister have some of the best selections of denim in terms of depth and breadth of embellishment, and that the denim is offered at price points that are materially lower than various boutique brands. **Moreover, as we have stated, our vendor sources continue to believe that denim will remain the "must have" pant bottom for Fall and that currently no other bottom category is as powerful as denim.**

(*Id.* at ¶ 66) (emphasis in original). Thomas Filandro, of Susquehanna Financial Group, stated:

> **Denim was once again noted as a key driver to the performance, increasing 166% in total.** The average unit retail selling price remained the primary comp driver increasing 20% plus, while transactions per average store and the average dollar sale also rose. **ANF continues to benefit from its improved inventory position, higher pricing, increased store level service and a positive denim cycle.** When comparing to last year's out-of-stock position in the fast turning denim classification, ANF remains well positioned to continue to deliver strong comp growth throughout 2005.
>
>         \*         \*         \*
>
>     Raising EPS estimates. Reflecting the very strong initial start to the second quarter and the underlying strength in the business, we are raising our 2Q05 EPS estimate by $0.17 to $0.69 (vs. $0.44), Y/Y growth of 57%. Based on the continued solid trend in denim we are also adding $0.02 to our 3Q05 EPS forecast to $0.76 (vs. $0.42), Y/Y growth of 81%. . . .

---

[4]"ANF" refers to Abercrombie and Fitch Co.

14

(*Id.* at ¶ 67 )(emphasis in original).  In addition, Adrienne Tennant, of Wedbush Morgan

Securities, issued a report on June 2, 2005 entitled: "ANF - Rumors of Denim's Demise Greatly

Exaggerated; Raising Estimates and Price Target."  The report stated that "Denim sales were up

166% over May 2004 compared to total sales up 43% over last year. We expect the company's

strong business momentum to continue and estimate that same store sales will rise 18% in June."

(*Id.* at ¶ 68).

On June 13, 2005, Robin Murchison, an analyst with SunTrust Robinson Humprey,

issued a report entitled: "ANF: Raising Estimates but Maintaining Neutral Rating."  The report

stated:

> ANF, like some others in the teen space, is benefitting from strong denim demand,
> both premium and basic.  Current trends continue to support this demand; we do
> not see this changing anytime soon.  Moreover, we believe the brand is strong
> enough to avoid what some view as a denim glut; think all denim is not created
> equal.

(*Am. Compl.* at ¶ 70).  Plaintiffs claim that throughout June 2005, analysts estimated

Abercrombie's second quarter fiscal year 2005 gross margin would exceed its 70% level from

second quarter fiscal year 2004.  (*Id.* at ¶ 71).

Abercrombie issued a press release on July 7, 2005 entitled: "Abercrombie & Fitch

Reports June Sales Increase of 52%; Comparable Store Sales Increase 38%."  The report stated:

> Abercrombie & Fitch Co. today reported net sales of $221.6 million for the five-
> week period ended July 2, 2005, a 52% increase over last year's net sales of
> $146.1 million for the five-week period ended July 3, 2004.  June comparable
> store sales increased 38% over the same period last year.
>
> Year to date, the Company reported a net sales increase of 39% to $927.4 million
> from $669.5 million last year.  Comparable store sales increased 25% for the year-
> to-date period. . . .
> Total company net sales increased 52%

> Total company comparable store sales increased 38%
> Abercrombie & Fitch comparable store sales increased 34%
> abercrombie comparable store sales increased 68%
> Hollister Co. comparable store sales increased 35%

(*Id.* at ¶ 72). Abercrombie also hosted a Sales Conference Call on July 7, 2005 during which

Lennox stated, in part:

> June results reflect strong selling from both summer clearance as well as initial
> selling from our back-to-school assortment. Summer clearance, which began
> during the final week of May versus the second week of June last year, was
> planned earlier to prepare for an expanded preview of our back-to-school
> assortment. Back-to-school was fully implemented during the fifth week of June,
> which is similar in timing to last year.

> In the Abercrombie & Fitch business, comparable-store sales increased 34%.
> Men's comps increased by high 30's. Women's comps increased by low 30's. in
> Men's strength in polos, graphic t-shirts and denim was partially offset by
> negative comps in the shorts business. In Women's, strong comps in denim,
> jackets and knit tops were partially offset by negative comps in shorts.

> Hollister comp-store sales increased 35%, with Guys' comps increasing by low
> 20's, Girls; increasing by low 40's. In Guys', strength in polos, denim and graphic
> t-shirts was partially offset by negative comps in shorts. In Girls', strong comps
> in denim, knit tops and accessories were partially offset by negative comps in
> swimwear and skirts.

> In the Kids' business, Abercrombie comparable-store sales increased 68% versus
> last year. Boys' comps increased by low 40's, with Girls' increasing by low 80's.
> In Boys', polos, graphic t-shirts an denim were strongest, and in Girls', knit tops,
> denim and accessories were strongest.

(*Id.* at ¶ 73).

Based on the June 2005 sales numbers, Abercrombie's share price opened at $70.00 on

July 7, 2005 and traded as high as $74.10. (*Id.* at ¶ 74). On July 7, 2005, analysts with SG

Cowen & Co. issued a report raising estimates for the second quarter fiscal year 2005 from $0.60

to $0.68. (*Id.* at ¶ 76). Analyst Mitch Kummetz, of D.A. Davidson & Co., issued a report on

July 7 entitled: "ANF: Another Monster Month Across All ANF Concepts; Raising Estimates and Price Target; Reiterating BUY Rating." The report raised EPS estimates from $0.66 to $0.72 and estimated a gross margin of 70.2%, stating:

> June sales rose 52% to $221.6 million. Consolidated same store sales were up 38%. This is above our estimate of 23.0% and consensus of 23.5%.
>
> Comps were driven by the summer clearance event (which moved up about two weeks from last year), as well as the initial selling of B2S [Back to School] merchandise (which was fully implemented in the fifth week of the month, same as last year).

(*Id.* at ¶ 77). Robin Murchison, an analyst with SunTrust Robinson Humphrey, issued a report on July 7, 2005 entitled: "ANF: June Comps Rise 38%; Raising 2Q Estimates." The report stated:

> ANF's June comps rose 38%, with strong gains in all three divisions. The company entered the month already in clearance mode having started it in late May, two weeks earlier than usual, to allow acceleration of the positioning of back-to-school merchandise in late June. The strategy worked quite well, and overall sales performance was driven by clearance and new items . . . . **ANF continues to bet strongly on denim**. Walk by a store front, and denim is lined up on tables perpendicular to the glass; it is a strong presentation given the length of the store front. Various denim treatments are strong with destroyed and embellished looks. . . .

(*Id.* at ¶ 78) (emphasis in original).

On July 8, 2005, an analyst with Wedbush Morgan Securities issued a report entitled: "ANF- Don't Get Off the Denim Bandwagon Just Yet; Expect a Rock Solid BTS [Back to School]; Raising Estimates and Price Target." The report raised second quarter 2005 EPS estimates from $0.57 to $0.70. (*Id.* at ¶ 79). The report stated:

> Denim strength should translate into continued business momentum at least through back-to-school. **We believe that recent fears of a "denim glut" will not be realized before the end of the back-to-school selling season, and we**

> **expect Abercrombie's business momentum to remain strong as it provides a
> compelling denim destination**. In addition, unlike some of its competitors,
> Abercrombie's monthly comp comparisons are easy for the next several months
> and manageable through December, which suggests strong comp potential through
> the remainder of the year . . . .

(*Id.*).   Throughout the month of July 2005, analysts estimated Abercrombie's gross margin
would exceed 70% and could be as high as 71.2% "based on Defendants' July 7 report and
communications with Defendants." (*Id.* at ¶ 80).

On August 4, 2005, Abercrombie issued a press release entitled: "Abercrombie & Fitch
Reports its July Sales Increase of 33%; Comparable Store Sales Increase 22%." The release
stated, in part:

> Abercrombie & Fitch Co. today reported net sales of $191.0 million for the
> fourth-week period ended July 30, 2005, a 33% increase over last year's July sales
> of $143.7 million. July comparable store sales increased 22% compared with the
> four-week period ended July 31, 2004.
>
> Year-to-date, the Company reported a net sales increase of 38% to $1.118 billion
> from $813.3 million last year. Comparable store sales increased 24% for the year-
> to-date period.
>
> July 2005 Highlights
> Total Company net sales increased 33%
> Total Company comparable store sales increased 22%
> Abercrombie & Fitch comparable store sales increased 15%
> abercrombie comparable store sales increased 53%
> Hollister Co. comparable store sales increased 24%

(*Id.* at ¶ 81).   Abercrombie held a Sales Conference call the same day as the foregoing press
release, reiterating the increase in store sales.

On August 4, 2005, analyst Stacy Pak, of Prudential Equity Group, issued a report sating

that denim sales were strong.  The same day, Wall Street Strategies issued a report stating:

> Although we do not base our rating on insider selling, we do observe trends in that
> category when applicable, and this time it is applicable.  Since June 2, insiders
> have sold 4,184,052 shares of the company's common stock, with most of those
> sales coming from CEO Michael S. Jeffries.  It goes to show that at the end of the
> day, management always seems to know something that John Q public doesn't.
>
> Taken as a whole, the company's July results were solid, and we continue to
> believe Abercrombie is a Buy and the premier play on teen retail.  We are
> expecting second quarter financial results to be impressive when they are released
> on August 16, 2005 . . . .

(*Id.* at ¶ 86).

Abercrombie's stock price fell from $70.24 on August 3, 2005 to $65.56 on August 4

"due to lower than consensus sales."  (*Id.* at ¶ 88).  Abercrombie stock continued to trade as high

as $67.80 over the next twelve days.  (*Id.*).

Plaintiffs allege that the Defendants' statements regarding Abercrombie's performance

were "materially false and misleading" because Defendants failed to disclose certain facts, in

particular:

- In March or April 2005, Defendant Jeffries hosted a meeting at Abercrombie's
  headquarters to discuss the strategy of significantly increasing denim inventory.
  Several high-ranking employees allegedly expressed concern about increased
  inventory because it would "materially skew the stock-to-sales ratio" and
  inventory could exceed market demand.  According to Plaintiffs, Jeffries
  dismissed concerns and said to "just go with it."  (*Id.* at ¶ 89).

- By May 2005, Defendants took drastic measures to sell excess denim and other
  products because inventory accumulated faster than it could be sold.  In particular,

19

Abercrombie held a Spring promotional clearance two weeks earlier than usual and discounts were 18% higher than in prior years.   Jeffries, Singer and Leino held a conference call with all district managers announcing cash bonuses and a free Jeep automobile for hitting denim sales targets.  (*Id.*).

- From May to July 2005, denim was significantly marked down and large volumes of denim was given to discount retailers.  In addition, inventory was sent back to the Distribution Center in New Albany, Ohio.  From May to June 2005, Abercrombie gave each store employee (approximately 70 employees per store) one pair of denim jeans at no charge except sales tax, and allegedly recorded these transactions as full sales.  (*Id.*).

Plaintiffs claim that, as a result of Defendants' efforts to clear excess denim and other products, Defendants' gross margin declined materially during 2Q FY05.  Plaintiffs claim that despite rising monthly sales figures, "sales were being made at lower than historical prices, so that the Company's overall profitability was declining."  (*Id.*).

Plaintiffs allege that based on internal reports and forecasts, Defendants knew that analysts' representations about earnings per share and gross margin for 2Q FY05 were not accurate.  Defendants regularly received internal reports about current and forecasted sales as well as markdowns, referred to as "Recap" or "Flash" reports; "Price Point Sheets;" and "markdown sheets."  Recap or Flash reports provided financial/sales information for all of Abercrombie's retail stores and were consolidated into weekly and monthly reports.  Price point sheets were one page documents that contained a markdown strategy for different items.  All markdowns were first approved by Jeffries and O'Neill before being distributed to the rest of the

20

company.  Stores received markdown sheets weekly from New Albany.  Stores also received weekly recap sheets, which monitored all markdowns and tracked sales figures by district and by store.  (*Id.* at ¶ 112).

In addition, Defendants Jeffries and Singer received "Weekly Operating Summary Reports" prepared by Abercrombie's Finance Group.  The reports tracked overall weekly sales and compared performance to the previous year.  The reports included an average dollar sale; the total selling margins by department; information on anticipated and existing inventory levels, by department; and all markups and markdowns by department.  (*Id.* at ¶ 113).  According to Plaintiffs, Defendants concealed material information and issued false and misleading statements to the public.

During this time, Defendant Jeffries sold 1,784,564 shares for $127, 891,680  in proceeds.  Jeffries' class period sales are identified as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 6/2/2005 | 20,000 | $64.53-$64.82 | $1,292,263 |
| 6/3/2005 | 10,000 | $65.20-$65.40 | $  652,916 |
| 6/7/2005 | 30,000 | $67.25-$67.40 | $2,020,051 |
| 6/8/2005 | 20,000 | $65.75-$65.93 | $1,316,532 |
| 6/10/2005 | 20,000 | $66.43-$66.70 | $1,330,590 |
| 6/13/2005 | 20,000 | $67.00-$67.01 | $1,340,012 |
| 6/14/2005 | 30,000 | $67.00-$67.66 | $2,015,978 |
| 7/7/2005 | 450,000 | $72.40-$73.80 | $32,966,121 |
| 7/8/2005 | 298,500 | $72.00-$72.96 | $21,574,519 |

| 7/11/2005 | 246,500 | $72.00-$73.48 | $17,902,752 |
| 7/12/2005 | 308,664 | $71.50-$72.97 | $22,159,871 |
| 7/13/2005 | 94,900 | $70.75-$72.42 | $ 6,792,952 |
| 7/14/2005 | 124,900 | $70.00-$71.00 | $ 8,773,601 |
| 7/15/2005 | 111,100 | $69.75-$69.91 | $ 7,753,522 |

(*Am. Compl.* at ¶ 122).

On August 29, 2005, *The Wall Street Journal* reported:

> But just ahead of the quarterly report came a surge of stock sales by the company's chairman and chief executive, Michael Jeffries. And some investors also are questioning whether Abercrombie provided investors with good news about certain apparel, helping to push the stock price higher, while withholding more downbeat information in the weeks leading up to the financial report and subsequent selloff.
>
>         *                    *                    *
>
> But the stock sales stand out because Mr. Jeffries hadn't sold more than 250,000 shares during any week in the past nine years, according to Thomson Financial. His weekly sales have generally been about 100,000 shares, according to securities filings. Indeed, in the week ended Aug. 19, Mr. Jeffries resumed his previous pattern by selling 100,000 shares at $58.50 each.
> "This is substantial selling," says Mark LoPresti, senior quantitative analyst at Thomson Financial, who focuses on trading by corporate insiders. "The stock has risen for about a year but his selling wasn't very heavy" until this summer . . . .

(*Id.* at ¶ 124).

Defendant Singer sold 37,500 shares on June 2, 2005 (22,500 shares at $62.10 and 15,000 shares at $62.20). The sale represented 27.41% of Singer's holdings and he made over $2.3 million as a result of the sale. Singer had not previously sold any Abercrombie shares. (*Id.* at ¶ 125). Defendant Chang sold 10,161 shares between June 3 to June 6, 2005 at an average price of $65.15, for a profit of $661,339. Defendant Leino sold 92,347 shares on June 2, 2005 at an average price of $64.56, for a profit of $5,954,069. Defendant O'Neill sold 6,298 shares on June

22

6, 2005 at an average price of $64.80, for a profit of $408,110. (*Id.* at ¶ 126).

On August 16, 2005, Defendant Abercrombie reported its second quarter fiscal year 2005 financial results. Defendant reported an EPS of $0.63 and its gross margin dropped by 1.8 % to 68.2%, compared to 2Q FY04. Inventory also increased by 67% per square foot. Abercrombie's press release stated:

> Inventories increased to $364 million from $227 million at the end of the first quarter of 2005 and $199 million at the end of the second quarter last year. **Most of this increase is represented by denim** and other basic merchandise categories which are not subject to significant markdown risk while fall fashion merchandise categories have been increased in line with the growth in sales. Remaining spring and summer merchandise levels are virtually unchanged from last year.

(*Am. Compl.* at ¶ 90) (emphasis in original).

Abercrombie held an investor conference call the same day and stated that difference in gross margin was due to increased markdowns on spring fashion merchandise as well as lower gross margins of Ruehl, which was in a start-up phase. (*Id.* at ¶ 91). The impact of Ruehl on Defendant's gross margin was characterized by Bob Singer, President and COO, as "fairly significant." (*Id.* at ¶ 92). On August 16, 2005, Defendant's stock price was $63.40. On August 17, it was $56.65. The stock reached a low of $44.17 in September 2005. (*Id.* at ¶ 93).

Anaylsts commented on Abercrombie's 2Q FY05 results, in particular how Ruehl "a 6 store organization on a base of 805, can possibly bring the total company gross margin down that much. . . ." (*Id.* at ¶ 95). According to Plaintiffs, Jeffries had stated on May 17, 2005 that Ruehl was "constantly improving gross margin." (*Id.* at ¶ 100). The *Wall Street Journal* published an article on August 29, 2005 regarding Jeffries' stock sales in June and July. The article questions Abercrombie's June 2 statements regarding denim sales. (*Id.* at ¶ 101). The same day,

23

Abercrombie announced that Singer would be leaving the company effective August 31, 2005. Analysts questioned the reason for his departure. (*Id.* at ¶¶ 103-04).

On January 5, 2006, Abercrombie disclosed that the SEC issued a formal order of investigation with respect to the trading in shares of Class A Common Stock. On June 14, 2006, the Board of Directors met to amend the Code of Ethics to adopt an Insider Trading Policy. (*Id.* at ¶¶ 106-07).

### Analysis

As stated above, the Court's task at this juncture is to consider whether " *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 127 S. Ct. at 2509 (citations omitted). As the Supreme Court held in *Tellabs*, the Court " must take into account plausible opposing inferences." *Id.* "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510.

The Court concludes that the allegations made in Plaintiffs' complaint, taken collectively, satisfy this standard. In the Court's view, a strong inference of scienter is shown through Plaintiffs' allegations that Defendants knew about Abercrombie's declining gross margins and storewide markdowns throughout the class period, yet failed to disclose the information. Assuming as true, as the Court must at this juncture, allegations that Abercrombie's gross margins in the second quarter of fiscal year 2005 were declining and that anticipated sales, particularly in the area of denim, were not materializing, support an inference of scienter. In

24

addition, the Court finds that the allegations regarding the timing and extent of the individual

Defendants' sales of stock further substantiate a strong inference of scienter. The sales were

made shortly after Abercrombie announced favorable sales numbers, which cause share prices to

increase 11% from $57.99 on June 1 to $65.00 on June 2, 2005. Taken collectively, the

allegations made by Plaintiffs give rise to a strong inference of scienter.

In reaching this conclusion, the Court finds that the inference of scienter is at least as

compelling as any opposing inference that could be drawn from the Plaintiffs' allegations.

Defendants raise plausible explanations for the turn of events in this case, in particular that the

events simply show a routine business fluctuation in sales. Defendants note that Abercrombie's

overall 2005 financial results were quite good. As for the sale of stock, Defendants argue that

while large quantities of stock were sold, the Defendants retained the majority of their holdings[5].

While these explanations cannot be discounted and, as with the Plaintiffs' claims, will be further

explored, the Court nevertheless concludes that the Plaintiffs' allegations are at least as

compelling. Thus, dismissal of the Plaintiffs' § 10(b) and Rule 10b-5 claims at this stage is not

appropriate.

### 2. Loss Causation Requirement

With respect to loss causation, the PSLRA provides:

(4) Loss causation

In any private action arising under this chapter, the plaintiff shall have the burden

---

[5]Defendant Jeffries retained 74.1% of his holdings and Defendant Singer retained 72.69% of his holdings. Defendant Chang sold 10,161 shares on June 3 and 6, 2005 but acquired 9.012 shares on June 7, 2005. Defendant Leino also sold and acquired shares on June 6, 2005. Defendant O'Neill sold 9.9% of stock owned.

of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

Defendants argue that the Plaintiffs have failed to adequately plead the loss causation requirement in their Amended Complaint. In particular, Defendants contend that Plaintiffs do not allege that the drop in Abercrombie stock price was caused by a correction, admission, disclosure of misrepresentation or restatement by Defendants. Plaintiffs maintain that they have adequately pled the loss causation requirement under the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).

In *Dura*, the Supreme Court stated that the PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." 544 U.S. at 346. With respect to the adequacy of pleading in the *Dura* case, the Court noted that there was only one allegation made regarding the loss element; specifically, that Plaintiffs paid an artificially inflated price for Defendant's stock and suffered damage. *Id.* The Court held that the allegation of paying an artificially inflated purchase price "is not itself a relevant economic loss." *Id.* at 347. "[T]he complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's [product]." *Id.*

In this case, Plaintiffs' Amended Complaint includes the following allegations with respect to loss causation:

During the Class Period . . . the Individual Defendants engaged in a scheme to

26

deceive the market and a course of conduct that artificially inflated Abercrombie's stock price and operated as a fraud or deceit on Class Period purchasers of Abercrombie stock by misrepresenting the Company's financial performance. Later, however, when the truth concerning Abercrombie's financial performance entered the market and became apparent to investors, Abercrombie's stock fell precipitously as the prior artificial inflation came out of Abercrombie's stock price. As a result of their purchases of Abercrombie stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

By reporting material increases in sales while concealing the fact that the gross margins of those sales were declining materially, the Individual Defendants presented a misleading picture of Abercrombie's financial position. Defendants' omissions and misleading statements caused Abercrombie's stock to trade at artificially inflated levels - reaching as high as $74.10 per share - throughout the Class Period.

On August 4, 2006, the Company reported comparable store sales for July 2005 increased by 22% over July 2004. This was below analysts' estimates of 28%. As a result of this news, Abercrombie's stock price fell from $70.24, its previous day's close, to $65.56 on 6,784,200 traded shares. The stock continued to trade at artificially inflated prices, however, for the next twelve days until Abercrombie reported disappointing gross margins and earnings.

After the market closed on August 16, 2005, the Company reported that 2Q FY 05 EPS was $0.63, $0.06 below consensus estimates of $0.69, Abercrombie's gross margin fell 1.8% from Abercrombie's 2Q FY04 gross margin of 70%, and its inventories increased to $364 million from $227 million at the end of 1Q FY05.

As a result of this news, Abercrombie's stock price fell from a high of $63.40 on August 16 to as low as $56.65 on August 17, a 10.65% drop on high volume of 9,695,200 traded shares. The average daily trading volume during the Class Period was 1,804,232. The average daily trading volume in the 76 days preceding the Class Period was 1,584,760.

[T]he timing and magnitude of Abercrombie's stock price decline negates any inference that the loss suffered by Plaintiff and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Abercrombie's stock price and the subsequent significant decline in the value of Abercrombie's stock when the truth was gradually revealed to the market.

27

(*Am. Compl.* at ¶¶ 130-35).

The Court finds that the Plaintiffs' allegations regarding economic loss causation are much more specific than those in the *Dura* case. Plaintiffs do not simply plead that they purchased stock at artificially inflated prices. Rather, Plaintiffs make specific claims as to Defendants' alleged misrepresentations and a purported link to Plaintiffs' claimed loss. While the Defendants argue that Plaintiffs fail to allege that the drop in Abercrombie stock price was caused by a correction, admission, disclosure of misrepresentation or restatement by Defendants, as this Court held in *In re Cardinal Health, Inc.*, 426 F.Supp.2d 688, 760 (S.D. Ohio 2006) (Marbley, J.), "where the Plaintiffs allege that the subject of the misrepresentations and omissions caused their losses, they need not specify 'corrective disclosures' causing the decline in stock value."

Defendants also contend that Plaintiffs' allegations regarding loss are deficient because the statements about Abercrombie's performance were accurate. This argument misses the mark. While the statements may have been accurate to a certain extent, Plaintiffs' claim is that the Defendants omitted disclosing other material information regarding Abercrombie's sales and inventory levels.

Finally, the Defendants maintain that they cannot be held responsible for information conveyed by the various analysts referred to in the Amended Complaint. According to Defendants, Plaintiffs fail to sufficiently allege an "entanglement" theory of liability, which holds that corporate officers and directors can only be liable for third-party forecasts if they have sufficiently entangled themselves with the forecasts, by placing their imprimatur, express or implied, on the analysts' projections. *See In re SmarTalk Teleservices, Inc.*, 124 F.Supp. 2d. 527,

544 (S.D. Ohio 2000). This Court held in *SmarTalk* that "Defendants can be held directly liable for providing false or misleading information to third party analysts" irrespective of the entanglement theory. *Id.* As in SmarTalk, Plaintiffs in this case allege that, regardless of the analysts' forecasts, Defendants made misleading statements by failing to provide a full and accurate picture of company performance. As this Court observed in *SmarTalk*, "to the extent that the Defendants' statements to analysts overlap with earlier statements they made, this presents an issue of causation the resolution of which is better left for the later stages of this litigation." *Id.* The Court finds that the same result applies in this case. Thus, regardless of the entanglement theory, the Court finds that Plaintiffs' allegations survive the motion to dismiss.

## B. Section 20(a) and 20A Claims.

The Defendants move to dismiss Plaintiffs' claims under § 20(a), which imposes legal responsibility on the "controlling person" in a company for Rule 10b-5 violations. The statue provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The cause of action requires a predicate violation of the securities laws or the rules and regulations promulgated thereunder. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696-97 (6th Cir. 2004).

29

Since the Court has not dismissed Plaintiffs' claims under § 10(b) and Rule 10b-5, the Defendants' motion to dismiss the § 20(a) claim is not well taken.  The Court reaches the same result as to the dismissal of the § 20A claims[6], which also require a predicate violation under a provision of the Exchange Act or the rules promulgated thereunder.

## IV.

In light of the foregoing, Defendant's Motion to Dismiss the Amended Complaint  (**Doc. #86**, 05-819; **Doc. #42**, 05-848; **Doc. #38**, 05-879; **Doc. #28**, 05-893; **Doc. #36**, 05-913; **Doc. #26**, 05-959) is **DENIED**.

**IT IS SO ORDERED.**

8 - 9 - 2007

**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[6]The statute provides, in part:
Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a).