IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| Robert Ross, Individually, | : | Consolidated Case Nos. |
| and on behalf of all others | | 2:05-cv-0819 |
| similarly situated, | : | 2:05-cv-0848 |
| | | 2:05-cv-0860 |
| Plaintiff, | : | 2:05-cv-0879 |
| | | 2:05-cv-0893 |
| v. | : | 2:05-cv-0913 |
| | | 2:05-cv-0959 |
| Abercrombie & Fitch Company, | : | 2:05-cv-0964 |
| et al., | | 2:05-cv-0998 |
| | : | 2:05-cv-1084 |
| Defendants. | | |
| | : | JUDGE SARGUS |

THIS ORDER RELATES TO:
ALL DERIVATIVE ACTIONS


OPINION AND ORDER

These ten cases are comprised of six actions filed by
investor plaintiffs under the Private Securities Litigation
Reform Act and four filed by shareholder plaintiffs as derivative
actions.  Earlier orders of the Court reflect that, after the
derivative actions were filed, defendant Abercrombie & Fitch
assembled a Special Litigation Committee to advise it about the
potential merit of the claims made in the derivative actions.
That report (which concludes that it would not be in
Abercrombie's best interest to pursue the claims) has been
completed, and a copy has been made available to the derivative
plaintiffs but not the other plaintiffs.

Both sets of plaintiffs have filed motions to compel that
are related to the report.  The investor plaintiffs have asked
the Court to order Abercrombie to provide them with both a copy
of the report and all of the underlying documentation.  The
derivative plaintiffs seek a fair portion, if not all, of the

underlying documentation as well as other documents relating to the work of the committee.  Abercrombie has opposed both motions. The motion filed by the investor plaintiffs will be addressed in a separate Opinion and Order.  For the following reasons, the motion to compel filed by the derivative plaintiffs will be substantially granted.

I.

The following facts, none of which are seriously in dispute, are germane to the derivative plaintiffs' motion to compel. After the derivative actions were filed, Abercrombie, acting pursuant to Delaware law, convened a Special Litigation Committee to determine if the continuation of the derivative litigation was in the best interests of the company.  See Zapata Corp. v. Maldonado, 430 A.2d 779 (Del. 1981).  That case held that a corporate board of directors may appoint a committee composed of independent directors and that such a committee may move for the dismissal of a derivative action if such dismissal is in "the best interests of the corporation, as determined by the committee."  Id. at 788.

The committee met and considered a large volume of documentation and other information.  According to a news release cited in Abercrombie's brief in opposition to the derivative plaintiffs' motion to compel, the committee reviewed more than 100,000 pages of documents and considered the results of more than fifty witness interviews.  See doc. #172, at 6.  At the conclusion of the process, it issued its report.  Based on that report, Abercrombie moved on September 10, 2007, to dismiss the derivative actions.  That motion, filed under seal and accompanied by a copy of the report, is awaiting a response from the derivative plaintiffs.  The content of the response depends, in part, upon the outcome of their motion to compel.

On March 27, 2007, shortly after the report was completed,

-2-

the derivative plaintiffs served interrogatories and document
requests upon Abercrombie relating to the report.  The document
requests asked Abercrombie to produce fourteen separate
categories of documents ranging from any drafts of the report to
all documents which were obtained by the committee, reviewed by
it, or relied upon by it in conducting its investigation and
preparing the report.  Except for certain information relating to
the relationship, if any, among members of the Special Litigation
Committee, Abercrombie, and the other defendants, and information
about certain aspects of the committee's review process,
Abercrombie did not produce documents to the derivative
plaintiffs.  Negotiations among counsel did not move the issue
toward resolution, and the Court must therefore decide if the
derivative plaintiffs are entitled to more information about the
committee's report.

II.

Although they have a copy of the report and certain
additional information relating to the independence of the
Special Litigation Committee and the procedures it followed, the
derivative plaintiffs contend that more information is necessary
in order for them successfully to oppose the motion to dismiss.
As the Zapata decision makes clear, a derivative action is not to
be dismissed at the request of the corporation simply because the
corporation makes that request.  Rather, the court to which the
motion is directed must first "inquire into the independence and
good faith of the committee and the bases supporting its
conclusions ...."  Id. at 788.  If the requisite level of
independence and good faith is found, "the Court must determine,
using its own business judgment, whether the motion should be
granted."  Id. at 789.  According to Zapata, this may result in
instances where the court denies a motion for summary dismissal
even though a truly independent committee has made a thorough
investigation and has come reasonably to the conclusion that the

-3-

continuation of the case is not in the corporation's best
interests.  In other words, the reviewing court does not simply
rubber-stamp reasonable decisions of a Special Litigation
Committee, but evaluates them in light of such factors as the
"spirit" of the proceedings, whether the lawsuit is deserving of
more thorough consideration, and how issues of law and policy
relate to the proposed dismissal.  Id.  The question then becomes
whether, in order to make all necessary arguments against
dismissal, the derivative plaintiffs ought to be granted access
to documents beyond the committee report and the other limited
categories of documents which Abercrombie has agreed to produce.

Quite a number of courts which have considered this issue in
the context either of the Delaware rule or a similar rule have
concluded that broad discovery concerning the activities of the
Special Litigation Committee is appropriate.  Certainly, Zapata
describes the permissible scope of such discovery as "limited,"
and the Delaware courts have recognized that if broad merits
discovery were to be permitted at this stage of the litigation,
much of the benefit of the procedure would be lost.  After all,
one purpose of allowing a corporation to move for summary
dismissal of a derivative action is to allow the company to save
the time and expense that would otherwise be devoted to a
litigation effort which may not be in the company's best
interests to pursue.  See, e.g., Kaplan v. Wyatt, 484 A.2d 501
(Del. Ch. 1984) (noting that while the purpose of discovery in a
Zapata proceeding is to "assist the Court in its inquiries into
the good faith and independence of the committee as well as its
inquiry into the bases supporting the conclusions of the
committee," id. at 507, "all-encompassing [merits] discovery is
not within the spirit of Zapata ...."  Id. at 511).  See also In
re Consumers Power Co. Derivative Litigation, 132 F.R.D. 455, 463
(E.D. Mich. 1990), commenting that the plaintiffs in such a
derivative action are entitled only to "limited discovery on the
independence, good faith, and procedural adequacy of the report."

Nevertheless, especially if the Court moves to the second step of the inquiry, which requires the Court to exercise its own independent judgment as to the costs and benefits of allowing the litigation to continue, the Court (and therefore the parties affected by the Court's decision, including the derivative plaintiffs) must necessarily be privy to a good deal of information.  Thus, the Court of Appeals for the Second Circuit has held that "if the litigation committee recommends termination and a motion for judgment follows, the committee must disclose to the court and the parties not only its report but all underlying data." Joy v. North, 692 F.2d 880, 893 (1982).  Other decisions from courts both within and outside that circuit agree.  See, e.g., Strugo ex rel. Brazilian Equity Fund v. Bassini, 1999 WL 249719 (S.D.N.Y. April 28, 1999); Zitin v. Turley, 1991 WL 283814 (D. Ariz. June 20, 1991).  The Court should be mindful, however, that the extent of the permissible discovery may depend to some extent on the thoroughness of the committee report, and that the scope of discovery should be tailored to the needs of each individual case.  See St. Clair Shore General Employees Retirement Sys. v. Eibeler, 2007 WL 3071837 (S.D.N.Y. October 17, 2007); see also Sutherland v. Sutherland, 2007 WL 1954444 (Del. Ch. July 2, 2007) (allowing more expansive discovery in a case involving two fifty percent shareholders and where the shareholder who was operating the company had a history of concealing information).

With this latter caution in mind, the Court has reviewed the Special Litigation Committee's report which is attached to Abercrombie's motion to dismiss, and summarizes the important (and non-confidential) features of that report here.  The report states that it was prepared by a two-person committee with the assistance of outside counsel (who are not litigation counsel in any of the cases before the Court).  Together, counsel and the committee considered depositions or interviews of over fifty witnesses and reviewed over 100,000 pages of documents.  It is

-5-

not possible to delineate how much independent investigation the committee members engaged in, other than to note that they both attended the interview of Michael Jeffries, Abercrombie's CEO, and one of them attended one other witness interview.  Summaries of the statements of additional witnesses, or depositions given by those witnesses in other proceedings, were also available to the committee members.  It is also not possible to determine the volume of underlying documentation each of the committee members reviewed.  The report itself provides a great deal of detail about the insider trading claim leveled against Mr. Jeffries, which does appear to be the single most significant claim in the derivative cases.  Although the report contains a fair amount of legal analysis on key issues such as the legal standard applicable to the various types of claims advanced in the derivative plaintiffs' complaints and whether Mr. Jeffries or others may have acted with the requisite state of mind, it is, at its core, a fact-based report which relies fairly heavily on credibility assessments of the people involved in Mr. Jeffries' stock trading decisions.  Should the Court opt to proceed to the second step of the <u>Zapata</u> analysis, it is likely that the Court will have to engage in at least some independent review of the witness statements and supporting factual material which persuaded the committee that Mr. Jeffries' trading decisions were not related to any material non-public information in his possession.

Despite Abercrombie's protestations to the contrary, almost every decision addressing these issues holds that notes of witness interviews or summaries of their statements can be obtained through discovery in a <u>Zapata</u> proceeding.  Even <u>Kindt v. Lund</u>, 2001 WL 1671438 (Del. Ch. December 14, 2001), a case relied upon by Abercrombie, allowed such discovery because it is relevant to "the procedure by which the Committee reached its decisions." <u>Id</u>. at 2.  Another case cited by Abercrombie for the proposition that "notes prepared in connection with witness

interviews" are not discoverable, Abercrombie's memorandum (doc. #172, at 7 n.2), Strougo ex rel. Brazilian Equity Fund v. Bassini, supra., actually allowed the derivative plaintiffs in that case to discover "the notes of interviews...." Id. at *7. The committee's report in this case highlights the crucial nature of these witness statements, and any argument intended to persuade the Court that the committee erred in relying upon them would have to be based upon their content, making any transcripts, summaries or notes of those interviews clearly discoverable.

The same can generally be said about the request to inspect the documents relied upon by the committee in reaching its conclusions on the factual and legal issues before it. For example, in Abbey v. Computer & Communications Technology Corp., 1983 WL 18005 (Del. Ch. April 13, 1983), another case relied upon by Abercrombie, although the court recognized that the limited discovery contemplated in Zapata was not to be "full Court authorized discovery of the same matters investigated informally by the Committee," the derivative plaintiffs were nonetheless entitled to see "the documentary materials utilized or relied upon by the Committee during its investigation." Id. at *3. Otherwise, the plaintiffs would find it difficult to assess the reasonableness either of the committee's investigation or the conclusions it reached based upon the materials before it. The cases cited by the Court above generally support that conclusion. It is true that Kindt v. Lund, supra., reached a contrary conclusion, but its rationale does not stand up under close scrutiny. That decision appears to distinguish between the content of witness interviews and summaries cited in the report, which it viewed as illuminating the procedure through which the committee reached its decision, and the documentary evidence cited in the report, which it characterized as "pertain[ing] to the underlying operative facts upon which plaintiff posits her derivative claim." Id. at *2. However, when a committee considers and relies upon both witness statements and documents

-7-

in reaching its conclusions, it is difficult to see why one
category of information would be discoverable and the other not.

Here, the Special Litigation Committee did not rest its
factual conclusions on witness statements alone.  It not only
reviewed (or had its counsel review) a large volume of documents,
but it expressly relied on the contents of many of those
documents, such as various financial and performance-related
documents generated in 2005, reports from analysts following
Abercrombie stock, transcripts of public conference calls held in
2005, and various human resources policies and procedures
relating to the employment discrimination lawsuit which underlies
another of the derivative plaintiffs' claims.  As part of the
Zapata procedure, the Court may well be called upon to determine
if the information in these documents correlates with the
committee's description of them and if they actually support the
committee's conclusions.

The possibility exists, of course, that some of the
documents reviewed by the committee or its advisors may have
added little to the committee's conclusions.  However, it is not
reasonably practicable to draw a dividing line between documents
reviewed or considered by the committee but not expressly cited
in the report, and documents that are specifically identified in
the report itself.  The Court presumes that the 100,000 pages of
documents to which the report refers, once they were separated
out from the larger universe of documents that are potentially
relevant to the claims advanced in the litigation, have been
maintained in that same segregated fashion and can readily be
produced.  Consequently, there should be little additional burden
involved in producing all, rather than some ill-defined subset
of, these documents.

The derivative plaintiffs have also requested copies of the
billing statements prepared by the committee's counsel.  They
assert that such statements will enable them to see how many
hours were spent on the investigation by category of attorney or

-8-

other law firm employee.  They have apparently already learned that Abercrombie was billed for 4,817.50 hour of time and paid more than $3 million for legal services rendered to the committee.  Abercrombie does not address this specific item at all in its response except for citing to one case, <u>Strougo</u>, which denied a similar request made by the derivative plaintiffs in that case.  While that case declined to compel production of such documents, it provided no rationale for doing so, instead discussing reasons why depositions of counsel to the committee are generally not permitted.

Despite the cursory nature of Abercrombie's response, the Court fails to see the relevance of this request.  Once the derivative plaintiffs were informed of the total number of hours spent by counsel in advising the committee and conducting the investigation detailed in the committee's report, it is hard to see how a breakdown of those hours between partners, associates, and others materially advances the Court's review of the <u>Zapata</u> issues.  If the committee's investigation was thorough and its reasoning is sound, whether it based its conclusions on legal work done by a partner, an associate, or a law firm investigator is unimportant.  There is also the likelihood that production of the entirety of the billing statements will create attorney-client privilege issues.  Consequently, the Court sees no reason to grant this request.  That is not true, however, with respect to the requests for documents that include summaries of the committee's meetings, which show the arrangements made and scope of work assigned to its advisors, or which reflect its document retention policy, if any (Document requests 12, 13 and 14).  Abercrombie has not argued the merits of these requests, and the information appears to be relevant to the committee's investigatory process.  Thus, Abercrombie will be directed to produce these documents.

III.

The only other issue that the parties have briefed is the

-9-

question of privilege and waiver.  The specific application of
this question to the other issues addressed in this Opinion is
not entirely clear.  Plaintiffs appear to take the position that
Abercrombie has waived any privilege which might otherwise attach
either to the report itself, or to any documents that the Court
might deem discoverable at this stage of the litigation, simply
by submitting the report under seal as part of its motion to
dismiss.  Abercrombie, on the other hand, relying on In re
Perrigo Co., 128 F.3d 430 (6th Cir. 1997), contends that because
its disclosure of the report in that fashion was essentially
mandated by law (at least to the extent that the law permits it
to move for dismissal of a derivative action), no waiver has
occurred.  However, neither party has identified a single
document about which a claim of either attorney-client or work
product privilege has been made.

     The Court agrees with the assertion in Abercrombie's
responsive brief that there are, as yet, no specific privilege
issues that are ripe for judicial determination.  Now that the
Court has more fully delineated the documents that are
discoverable by the derivative plaintiffs in connection with the
Zapata proceeding, Abercrombie will be in a better position to
determine if it has any viable claim of privilege concerning any
specific document covered by this order.  It is the Court's
expectation that many of the documents reviewed either by counsel
or the Special Litigation Committee are business or personal
documents to which no claim of privilege has ever attached, and
certainly such documents did not acquire privileged status simply
because they may have been reviewed by counsel or supplied to the
committee by an attorney.  The same is likely true with respect
to factual summaries of witness interviews.  The Court expresses
no view at this time whether any previously privileged documents
lost that status if the committee reviewed and relied upon them
in reaching its conclusions, or whether any documents which
contain not only factual statements but mental impressions of

-10-

counsel to the committee may be protected by the work product privilege. Such issues shall be addressed first by the parties, and presented to the Court only if they cannot reach a resolution extrajudicially. The same shall apply to any draft of the report which was prepared by counsel to the committee.

IV.

Based on the foregoing analysis, the derivative plaintiffs' motion to compel (#160 in Case No. 2:05-cv-819) is granted as follows. Within 30 days, Abercrombie shall produce all documents responsive to the following document requests: 2,4,5,11,12,13, and 14. The motion is denied in all other respects.

Any party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5. The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due ten days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.4.

/s/ Terence P. Kemp
United States Magistrate Judge

-11-