## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**IN RE ABERCROMBIE & FITCH CO.**
**DERIVATIVE LITIGATION**

                **Case No. 2:05-cv-00819**

                **Judge Edmund A. Sargus, Jr.**
                **Magistrate Judge Kemp**

## OPINION AND ORDER

This matter is before the Court on nominal Defendant Abercrombie & Fitch Co.'s Motion to Dismiss this consolidated shareholder derivative suit. (Doc. 120). For the reasons that follow, the motion is GRANTED, and the derivative action is DISMISSED.

**I.**

Plaintiffs in this consolidated shareholder derivative action bring suit on behalf of and against nominal defendant Abercrombie, alleging that certain members of Abercrombie's Board of Directors made false and misleading public statements, engaged in or sanctioned insider trading, and mismanaged the Company by maintaining or endorsing discriminatory employment practices.[1] The consolidated Derivative Complaint (doc. 60), filed July 10, 2006, contains six causes of action:

(1)     Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information;

(2)     Against All Defendants for Breach of Fiduciary Duty;

(3)     Against All Defendants for Abuse of Control;

---

[1] The consolidated securities class actions pending before this Court, although consolidated with the shareholder derivative case for purposes of case management, are not implicated by Abercrombie's Motion, or by this Opinion and Order.

(4)     Against All Defendants for Gross Mismanagement;

(5)     Against All Defendants for Waste of Corporate Assets;

(6)     Against All Defendants for Unjust Enrichment.

The Court has jurisdiction over this action under 28 U.S.C. §§1332(a)(2) and 1367(a).

The following background and procedural facts are not in dispute. On October 10, 2005, Abercrombie's Board of Directors (the "Board") created a Special Litigation Committee (the "SLC") to investigate the derivative plaintiffs' claims. Two board members, Daniel Brestle and Allan Tuttle, were the committee's original members; Mr. Brestle was later replaced by Lauren Brisky, for reasons unrelated to this matter. The Board delegated authority to the SLC to "investigate, review and analyze the facts, circumstances and issues discussed" and "to determine whether maintenance of [the derivative] action would be in the best interest of the Company." (Cupps Aff. at ¶4, doc. 120 at Ex. A). The Board did not retain authority to review the SLC's investigation or conclusions. (Tuttle Aff. at ¶4, doc. 120 at Ex. D). The SLC retained the law firm of Cahill Gordon & Reindel LLP to assist in its investigation. (Id. at ¶7). Cahill Gordon had not previously represented Abercrombie or the individual defendants. (Id.)

Following more than a year of investigation, the SLC produced a 144-page report, with exhibits (the "SLC Report"). The SLC concluded that there was no evidence to support the claims asserted in the derivative case, and directed Abercrombie to seek dismissal of the derivative case. Abercrombie moved to dismiss on September 10, 2007, relying upon and attaching the SLC report.[2]

---

[2] Abercrombie's Motion to Dismiss, the SLC Report, and the parties' subsequent memoranda have been filed under seal.

Plaintiffs do not contend that Abercrombie acted improperly by forming an SLC to investigate their claims[3]; they do not dispute the objective qualifications of the SLC committee members, and they do not question the independence of Cahill Gordon or its ability to assist the SLC in the investigation. Rather, Plaintiffs contend that Abercrombie has failed to meet the standard for dismissal, as set out below, by establishing: 1) that the SLC was independent; 2) that the SLC's investigation was adequate to satisfy the requirement of "good faith"; and 3) that the SLC had reasonable bases for its conclusions.

## II.

### A.    *Applicable Law*

The parties agree that, because Abercrombie is a Delaware corporation, the substantive law of Delaware applies to this shareholder derivative action. *See Burks v. Lasker,* 441 U.S. 471 (1979), *In re General Tire and Rubber Co. Securities Litigation,* 726 F.2d 1075 (6th Cir. 1984); *Brown v. Ferro Corp.,* 763 F.2d 798, 802-803 (6th Cir. 1985) ("Shareholder's derivative actions are governed by Rule 23.1 of the Federal Rules of Civil Procedure, and federal courts apply the law of the state in which the company is incorporated.").

### B.    *Standard of Review*

The Delaware Supreme Court, in *Zapata v. Maldonado,* 430 A.2d 779 (Del. 1980), established the standard governing a corporation's motion to dismiss a shareholder derivative

---

[3] When a shareholder has not made a demand on the board before filing a derivative suit on the grounds that demand is excused, as in this case, the board may form a special litigation committee to decide whether the corporation – as the real party in interest – should proceed with the litigation. *See In re M&F Worldwide Corp. S'holders Litig.,* 799 A.2d 1164, 1174 n. 31 (Del. Ch. 2002); *Kaplan v. Wyatt,* 484 A.2d 501, 506-07 (Del. Ch. 1984).

3

complaint on the basis of an SLC's determination that proceeding with the litigation would not

serve the best interests of the company.

> Under the language of *Zapata*, a motion to terminate a derivative suit is neither a motion
> to dismiss under Rule 12(b), nor is it a motion for summary judgment pursuant to Rule
> 56, because it is addressed neither to the adequacy of the cause of action alleged in the
> complaint nor to the merits of the issues joined by the pleadings. Rather, the motion is a
> "hybrid" one, derived by analogy to a motion to dismiss a derivative suit based upon a
> voluntary settlement reached between the parties and to a motion brought pursuant to
> Rule 41(a)(2), whereby a plaintiff unilaterally seeks a voluntary dismissal of the
> complaint subsequent to the filing of an answer by the defendant.

*Strougo v. Bassini*, 112 F.Supp. 2d 355, 361-62 (S.D.N.Y. 2000).

The *Zapata* court directed that:

> After an objective and thorough investigation of a derivative suit, an independent
> committee may cause its corporation to file a pretrial motion to dismiss in the Court of
> Chancery. The basis of the motion is the best interests of the corporation, as determined
> by the committee. The motion should include a thorough written record of the
> investigation and its findings and recommendations. Under appropriate Court
> supervision, akin to proceedings on summary judgment, each side should have an
> opportunity to make a record on the motion. As to the limited issues presented by the
> motion noted below, the moving party should be prepared to meet the normal burden
> under Rule 56 that there is no genuine issue as to any material fact and that the moving
> party is entitled to dismiss as a matter of law.

*Zapata*, 430 A.2d at 788.

In considering a *Zapata* motion, the court does not adjudicate the merits of the underlying

complaint, but determines instead whether the corporation has met its burden to establish that the

SLC was independent, acted in good faith, and had reasonable bases for its recommendation.

*Strougo*, 112 F.Supp. 2d at 362; *Lewis v. Fuqua*, 502 A.2d 962, 966 (Del. Ch. 1985).[4]

---

[4] As set out above, this matter does not relate to or implicate the issues raised in the
securities class action claims pending before this Court. Likewise, the standard of review applied
to this *Zapata* motion is entirely different from that applied to Abercrombie's motion to dismiss
the complaint brought under 15 U.S.C. §78u-4. (August 9, 2007 Opinion and Order, Doc. 107).

4

Independence, good faith and reasonableness are not presumed, and "if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion." *Zapata*, 430 A.2d at 789.

If the court is satisfied under Rule 56 standards that the committee was independent, acted in good faith, and showed reasonable bases for its findings and recommendations, the court may proceed, in its discretion, to the next step. The second step of *Zapata* is wholly discretionary, and authorizes the court to apply its own independent business judgment in analyzing the conclusions of the SLC. *Id.*

## III.

In considering Abercrombie's motion to dismiss, the Court considers not the merits of Plaintiffs' causes of action, but whether the SLC's investigation was conducted independently and in good faith, and whether its conclusion – that pursuing the complaint is not in the best interests of the corporation – is reasonable.

### *A.* *Independence of the SLC*

Under Delaware law, "a director is independent when he is in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations and influences." *Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del. 1985); *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984). Whether a special litigation committee's decision to terminate derivative litigation is independent depends on the "totality of the circumstances." *See Johnson v. Hui*, 811 F. Supp. 479, 486 (N.D. Cal. 1991) (applying Delaware law). Delaware courts look to a number of factors when applying the "totality of the circumstances" test: (1) a committee member's status as a defendant, and potential liability; (2) a committee member's participation in or

5

approval of the alleged wrongdoing; (3) a committee member's past or present business dealings with the corporation; (4) a committee member's past or present business or social dealings with individual defendants; (5) the number of directors on the committee; and (6) the "structural bias" of the committee. *Id.* (citations omitted).

### 1. Mr. Tuttle

Plaintiffs herein allege that Allan Tuttle's acknowledged friendship with Defendant Singer creates an issue of fact as to his independence. Robert Singer served as Abercrombie's President and Chief Operating Officer from May 2004 until August 2005. It is undisputed that Mr. Singer recruited Mr. Tuttle to the Board, and that the men previously worked together at Gucci and considered one another a friend. That fact alone, according to Plaintiffs, creates a material question regarding Mr. Tuttle's independence as a member of the SLC.

A director's independence may be compromised by financial, familial or social ties to other persons who are interested in the board's decision, but only if the plaintiffs plead facts that would support the inference that the director would be more willing to risk his or her reputation than to risk the relationship with the interested person. *Beam v. Stewart*, 845 A.2d 1040, 1052 (Del. 2004). Friendships and business relationships within a board, even such relationships that arose before the directors became board members, are not enough to create a reasonable doubt about directors' independence from each other, although a "particularly close or intimate personal or business affinity" could do so. *Id.* at 1051. In practice, the standard is demanding. For example, in *Stewart*, the derivative complaint described the "longstanding friend[ship]" between a director and Martha Stewart, the owner of 94% of the stock in the corporation, and included a news article detailing the "close personal relationship" between the two. *Id.* at 1045,

6

1051. The Delaware Supreme Court held that the complaint did not present even a "close call" for establishing a reasonable doubt about the director's independence from Stewart in order to establish futility of a demand to sue Stewart. *Id.* at 1054. "Mere allegations that [the directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes." *Id.* at 1051-52.[5]

Abercrombie cites to numerous cases wherein personal friendships and previous working relationships have not been perceived as compromising a director's independence. *See, e.g., Litt v. Wycoff*, 2003 Del. Ch. LEXIS 23, *16 (Del. Ch. Mar. 28, 2003); *In re Grace Energy Corp. S'holders Litig.* 1992 Del. Ch. LEXIS 134, *11 (Del. Ch. June 26, 1992) ("[C]onclusory allegations of such personal affinity alone are not sufficient to establish director interest. Actual financial interest must be shown."). On the other hand, the cases Plaintiffs rely upon involve SLC members so intertwined with those they are investigating, that independence would be difficult to establish. For example, in *In re Oracle Corp.*, 824 A.2d 917 (Del. Ch. 2003), the SLC consisted of Stanford professors, one of whom was charged with investigating a former professor of his, with whom he served on a prestigious steering committee. The committee was also required to investigate a major financial contributor to Stanford. The *Oracle* opinion contains twenty pages describing the ties between the defendant board members and the members of the SLC committee. *Id.* at 929-948. In the end, the court held that such connections

---

[5] Appraising independence for the purposes of demand excusal and SLC membership takes into consideration the same factors. *See St. Clair Shores General Employees Retirement System v. Eibeler*, 2008 U.S. Dist. LEXIS 57546 (S.D.N.Y. July 30, 2008), citing *Oracle*, 824 A.2d at 938-39 (Discussing cases involving demand excusal and noting that the formula for evaluating the independence of special litigation committees is consistent with that which applies in demand excusal cases.).

generate "a reasonable doubt about the SLC's impartiality because they suggest that material considerations other than the best interests of Oracle could have influenced the SLC's inquiry and judgments." *Id.* at 947.

The associations and contacts of the type which Mr. Tuttle has had with Defendant Singer are not intricate, inappropriate, or such as to suggest that Mr. Tuttle would not faithfully discharge his obligations to Abercrombie's shareholders. "Business dealings seldom take place between complete strangers and it would be a strained and artificial rule which required a director to be unacquainted or uninvolved with fellow directors in order to be regarded as independent." *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1441 (N.D. Cal. 1994); *see Johnson*, 811 F.Supp. at 487. Plaintiffs do not allege that Mr. Tuttle had any monetary or material interest, such that he might feel a sense of owing or beholding to Mr. Singer or to Abercrombie. *See In re The Limited, Inc. S'holders Litig.*, 2002 Del. Cb. LEXIS 28 (Del. Ch. Mar. 27, 2002) (potential for sense of "owingness" due to significant monetary donation to Ohio State by Mr. Wexner created reasonable doubt with regard to independence of the president of Ohio State); *see also Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (Independence lacking where "the entity has direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.").

The Court finds that Abercrombie has established that Mr. Tuttle was independent, in that he was able to "base his decision on the merits of the issue rather than being governed by extraneous consideration or influences." *Katell v. Morgan Stanley Group*, 1995 Del. Ch. LEXIS

8

76, *19 (Del. Ch. June 15, 1995) (quoting *Kaplan*, 499 A.2d at 1189). The undisputed evidence of independence includes the following. Mr. Tuttle became a director three months before the first derivative complaint was filed, and well after the time period at issue in the litigation. (Motion, doc. 120, at 13 and Tuttle Aff., Ex. D, ¶2). Mr. Tuttle's lengthy and distinguished career, as detailed in his affidavit, and his lack of prior business or social relationships with anyone at Abercrombie, apart from Mr. Singer, is evidence that Mr. Tuttle was not beholden to, or controlled by any defendant. Moreover, the Board anticipated that Mr. Tuttle's independence might be questioned, and considered his prior relationship with Mr. Singer before appointing Mr. Tuttle to serve on the SLC. (Report, doc. 120-3, at 11). The Board concluded that being a former colleague and friend of another director did not foreclose independence; yet Mr. Tuttle took the additional cautionary step of abstaining from investigation or consideration of Plaintiffs' claims directed against Defendant Singer. (Id.; *see also* Motion to Dismiss, doc. 120, at Exs. D and E, Brisky and Tuttle Affidavits).

For these reasons, the Court finds no material question of fact as to Mr. Tuttle's independence.

## 2. Ms. Brisky

Plaintiffs contend that the second SLC committee member, Lauren Brisky, lacked independence due to her role as a member of Abercrombie's Audit Committee since 2003 and her status as a defendant. Plaintiffs further suggest that Ms. Brisky's participation in the alleged wrongdoing, and therefore her potential liability, renders her incapable of independent consideration of the merits of Plaintiffs' claims. Courts in Delaware and elsewhere have found otherwise.

9

In *Kaplan*, 499 A.2d at 1189, the Delaware Supreme Court reaffirmed that "a director is independent when he is in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences... it is the care, attention and sense of individual responsibility to the performance of one's duties that touch on independence." The plaintiffs in *Kaplan* questioned the independence of the SLC, because a committee member was also a member of the Board of Directors at the time of the alleged transactions and had investments and affiliations with companies that conducted substantial business with the defendant corporation. *Id.* "The mere fact that a director was on the Board at the time of the acts alleged in the complaint does not make that director interested or dependent so as to infringe on his ability to exercise his independent business judgment of whether to proceed with the litigation. . . Even a director's approval of the transaction in question does not establish a lack of independence." *Id.* (quoting *Aronson*, 473 A.2d at 815). *See also Katell*, 1995 Del. Ch. LEXIS 76, *21; *Kindt v. Lund*, 2003 Del. Ch. LEXIS 62, *8 (Del. Ch. Ct. May 30, 2003) ("[SLC member] Senator Garn was on the board, approved the challenged transactions, and is a defendant in this action, but had no financial interest in any of the transactions. The fact that Senator Garn was on the board and approved the transactions does not negate his independence. Nor does his being named as a defendant cause Senator Garn to lack independence. It is undisputed that his only connection with the defendants is through his service on the NSE board.").

Ms. Brisky is the Vice Chancellor for Administration and Chief Financial Officer of Vanderbilt University. (Motion, doc. 120, at Ex. E, Brisky Aff. at ¶3). Her duties include oversight of the University's financial management and administrative infrastructure, including

10

facilities and construction, human resources, information systems, and business operations. (Id.) It is not in dispute that Ms. Brisky had no business or social relationships with Abercrombie or other members of the Board prior to becoming a member of the Board. Vanderbilt University also has no financial or other relationship with Abercrombie or its Board members. (Id. at ¶4.) As in *Kindt*, Ms. Brisky's only connection to Abercrombie was through her service on the Board. Plaintiffs repeat the allegations from the complaint and explain the nature of Ms. Brisky's fiduciary duties as a member of the Audit Committee and a financial expert, but have not shown how Ms. Brisky's Board membership impaired her ability to exercise independent business judgment or influenced her decisions as a member of the SLC. *See Kaplan*, 499 A.2d at 1189. Abercrombie has established that Ms. Brisky had the independence necessary to consider the merits of Plaintiffs' claims in light of the best interests of the Company, and not her own.

Additional indicia of the SLC's independence are not in dispute. The SLC retained the law firm of Cahill Gordon to advise and assist in the investigation. Cahill Gordon had no prior connection to Abercrombie, and Plaintiffs do not dispute the qualifications or independence of the firm. Plaintiffs also have not challenged Abercrombie's assertion that the SLC conducted its investigation with the full cooperation of the Company, and without interference from the Board. (Report at 12-13).

For the foregoing reasons, the Court finds that the first *Zapata* requirement of independence was satisfied by the SLC comprised of Mr. Tuttle and Ms. Brisky.

### B. Good Faith, Reasonable Investigation

Plaintiffs assert that genuine issues of material fact as to the good faith and adequacy of the SLC's investigation prevent dismissal. Plaintiffs do not dispute the thoroughness of the

11

investigation conducted by the SLC generally, but rather assert that the committee members did not take on appropriate roles and were not adequately involved in conducting the investigation. *Zapata* does not define a "good faith" or "reasonable" investigation, and as the Delaware court noted in *Kaplan* and *Katell*, "the Zapata procedure encourages Plaintiffs to bring an all out attack against the details of the Special Committee's investigation." *Katell*, 1995 Del. Ch. LEXIS 76, *26.

This Court has reviewed the record of the SLC's investigation of this matter, including Abercrombie's discovery responses regarding the Committee's work, the 144-page Report, with exhibits, Ms. Brisky's deposition transcript, and the affidavits of Ms. Brisky, Mr. Thier, and Mr. Tuttle.[6] The Court finds evidence that the investigation was conducted in a reasonable manner, and in good faith. Specifically, the following facts reflect a good faith investigation on the part of both SLC members: twelve in-person meetings with Cahill Gordon from November 4, 2005 to February 19, 2007; nine conference calls with counsel in the same time period; regular review of source material (original company documents), interview summaries and chronological matrices prepared by counsel.

Plaintiffs acknowledge that Mr. Tuttle's involvement was "more extensive" than Ms. Brisky's. There is no legitimate factual dispute concerning Mr. Tuttle's leadership of the investigation as chairman of the SLC. The record shows that he directed Cahill Gordon's work, attended interviews, reviewed source documents, SEC transcripts and witness interview statements.

---

[6] Mr. Tuttle passed away on August 31, 2008, several days before his scheduled deposition. Mr. Thier is an attorney at Cahill Gordon familiar with Mr. Tuttle's work on the SLC.

To the extent Plaintiffs maintain that the SLC improperly relied upon its counsel to

conduct the investigation, Delaware case law is again inapposite. Specifically on the issue of

reasonableness, the court in *Katell* sanctioned the committee's reliance on counsel.

> [The committee] selected capable counsel to assist their investigation and relied heavily
> on that counsel. I find nothing unreasonable about CIGNA LCF's reliance on counsel.
> As I explained in Part II of this opinion, the Special Committee has only one
> member--CIGNA LCF. CIGNA LCF can select any agent to perform its duties as Special
> Committee, as long as the agents can perform their assigned tasks competently. Plaintiffs
> have not asserted that LCF's counsel had an improper conflict of interest or
> incompetently conducted the interviews. CIGNA LCF's heavy reliance on its competent
> attorneys does not render its investigation unreasonable.

*Katell*, 1995 Del. Ch. LEXIS 76, \*28. Likewise, in *Carlton Invs. v. TLC Beatrice Int'l Holdings*,

1997 Del. Ch. LEXIS 86, \*47 (Del. Ch. May 30, 1997), the court held that, "where there is no

evidence of overreaching by counsel or neglect by the SLC, the court ought not second guess the

SLC's decisions regarding the role which counsel played in assisting them in their task."

Similar to the facts in *Carlton*, in this matter, counsel to the SLC reviewed more than

100,000 pages of Company documents and interviewed 53 current and former employees,

executives, directors and outside advisers of Abercrombie. (Report at 12-13). According to

Abercrombie, Cahill Gordon spent 4,817.50 hours assisting the SLC in the investigation of

Plaintiffs' claims. (Doc. 287, Ex. D). The extent of the investigation is not in dispute; rather,

Plaintiffs contend that the two individual committee members were not adequately involved.

Based upon the record, the Court is satisfied that:

> throughout the process, the SLC met with its counsel to be updated on its findings,
> personally reviewed transcripts on documents relating to important or unclear issues, and
> appear to have made the final substantive judgments. . . . [Ms. Bresky and Mr. Tuttle]
> both exhibited an understanding of their role, a familiarity with the record, and
> confidence that the decisions they made were in the best interests of the company.

*Id.* at *47. (*See* Brisky Dep. Tr. at 43, 44, 73, 82; *see also. generally,* affidavits of Thier and

Tuttle).

Accordingly, the Court finds that the second *Zapata* factor has been satisfied, in that the

SLC conducted a reasonable investigation in good faith.

## C. *Reasonable Bases for Conclusions*

The third step under *Zapata* requires the Court to determine whether the SLC's

conclusions are reasonable.

> In reviewing the Special Committee's conclusions, the Court does not take an
> independent look at the merits of [the] lawsuit, but must find that the Special
> Committee's consideration of the merits of the claims was reasonable. *See Fuqua*, 502
> A.2d at 967. The Special Committee has to demonstrate the reasonableness of the bases
> of its conclusions with undisputed facts. *Zapata*, 430 A.2d at 787. This requires the
> Special Committee to show that Plaintiffs do not dispute the existence of information or
> evidence relied on by the Special Committee, but it does not require the Special
> Committee to show that the parties do not dispute material facts regarding Plaintiffs'
> allegations. *Kaplan*, 484 A.2d at 519. The Special Committee can use undisputed
> information to form its own conclusions as to factual disputes concerning Plaintiffs'
> allegations. *See Kaplan*, 484 A.2d at 519.

*Katell*, 1995 Del. Ch. LEXIS 76 at *33-34.

### 1. The SLC's Conclusions

The SLC considered Plaintiffs' claims in three categories: 1) those based on allegations of

false or misleading public statements made by the Company regarding Abercrombie's

performance in the Second Quarter of 2005; 2) claims based on allegations of insider trading; and

3) allegations regarding discriminatory hiring practices.

The SLC first concluded, based upon its factual investigation, that there was no evidence

to support claims that "any public statement made by the Company during the Second Quarter of

2005 was untrue or misleading." (Report at 107-08). Second, the SLC found "no evidence

14

sufficient to establish that [defendant] Jeffries... – or any other Trading Defendant – possessed material, non-public information at the time of either the June or July trades," and no evidence of scienter on the part of the Trading Defendants. (Id. at 116, 123).

Plaintiffs have not contested the SLC's conclusion regarding the discrimination claims:

> Defendants did not and could not reasonably have known of the practices [alleged to be discriminatory] ..., and that they had taken all reasonable steps to ensure that any such practices would be prevented. As a result, the SLC determines that the discrimination claims could not be sustained and it would not be in the Company's best interest to pursue them.

(Report at 144). The Court finds that this conclusion has reasonable bases in the undisputed facts set out in the SLC Report, and Plaintiffs' discrimination claims are hereby dismissed.

## 2. Plaintiffs' Contentions

Plaintiffs do, however, contest the reasonableness of the SLC's conclusions regarding the allegations of false and misleading statements and insider trading. Plaintiffs specifically contend that Abercrombie moved away from its public, non-promotional strategy, and instead took "earlier and deeper" markdowns in the Second Quarter of 2005. Plaintiffs allege that the SLC failed to address testimony and evidence of Abercrombie's departure from its publicly disclosed non-promotional strategy, and its efforts to "unload" excess denim inventories. According to Plaintiffs, the evidence establishes that "the Board caused or allowed Abercrombie to conceal that the Company had departed from its non-promotional strategy...seriously undercutting its profitability and gross margins" and artificially inflating Abercrombie's stock price. (Doc. 275, Pls' Mem. Opp. at 25). It was during this period, according to Plaintiffs, that the Trading Defendants exploited private information for their own benefit, by selling nearly 2 million shares

of Abercrombie stock. (Id. at 26). *See Carpenter v. United States*, 484 U.S. 19, 27-28 (elements of unlawful insider trading).

Without considering the merits of Plaintiffs' allegations, the Court looks to the SLC Report to determine whether the SLC has established the reasonableness of its conclusions, based upon undisputed facts. It is clear from the parties' extensive memoranda and exhibits that they do not dispute the underlying material facts. Abercrombie's stock price and quarterly financials, analysts' expectations, inventory levels, statements and representations made during investor conference calls, and the sale of stock by defendants Jeffries, Singer, Bachman, Griffin and Kessler are matters of public record. Rather, the parties diverge in their respective analysis of the events that took place during the Second Quarter of 2005, concluding with Abercrombie failing to meet the consensus expectations of securities analysts.

### 3. False or Misleading Statements

In analyzing whether Abercrombie misled analysts and investors with regards to its promotional activities, the SLC points to a recognized distinction in the retail industry between "promotional" and "clearance" markdowns.[7] The SLC found that Abercrombie publicly disclosed that its "clearance" period for spring merchandise "was planned earlier" and that the Company did not engage in promotional activities, in accordance with its public strategy. (Report at 20-21, citations omitted).

The Report also addresses the denim inventory issue, highlighting Mr. Jeffries' statement to analysts in May, 2005 that "we are going to intensify the denim inventories." (Id. at 48,

---

[7] Generally, promotional markdowns are temporary price incentives designed to increase store traffic, while clearance markdowns are a regular part of the business cycle, designed to clear out seasonal items. (Report at 20, citations omitted).

citations omitted). The SLC further relied upon Abercrombie's record-high denim sales in the Second Quarter of 2005 to support its conclusion that denim sales were as strong as the Company reported, and that the Company did not disseminate false or misleading information in connection with its denim inventories or sales.

With respect to the guidance Abercrombie provided to analysts regarding Second Quarter 2005 performance and margins, the SLC Report contains an extensive chronology of both the Company's financial performance during the quarter and its public statements regarding its performance. The SLC found that, in accordance with its announced policy, the Company provided annual guidance to market analysts, and not quarterly financial performance estimates. Therefore, the SLC concluded, Abercrombie had no duty to correct analyst forecasts with respect to projected earnings, or to provide its own estimates of Second Quarter results. (Report at 110). In summary, the SLC did not find evidence sufficient to support a claim that Defendants breached their fiduciary duties by "knowingly disseminat[ing] false information" about the financial condition of the company that "result[ed] in corporate injury." *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998).

### 4. Insider Trading

As to the insider trading allegations, the SLC Report addresses at some length the magnitude and timing of the allegedly unlawful trading, and the reasons provided by the Trading Defendants for their sales of Abercrombie stock. In summary, the SLC found no evidence that the Trading Defendants were in possession of material, non-public information at the time of their trades, or that any of the defendants acted with scienter by trading for personal gain based on the content of non-public information. *See Oracle*, 867 A.2d at 906.

17

There is no dispute that each contested trade took place during a scheduled open trading window. The SLC inquired as to the procedures followed to ensure that each Trading Defendant was authorized to trade, and found that each Defendant had a credible explanation for his trades. (Report at 115, *et seq*.) For example, the SLC found that Mr. Jeffries had been closed out of several previous trading windows, and traded in accordance with his established trading pattern and in keeping with his personal financial planning needs. (Id.) The SLC also considered the volume of defendants' trades, and concluded that it did not support an inference of scienter. Mr. Jeffries retained 75% of his exercisable options, and more than 80% of his total Abercrombie holdings after his July, 2005 trading. Director Kessler retained nearly 90% of his holdings. (Report at 128). *See Oracle*, 867 A.2d at 954.

Most importantly, the SLC found no evidence that any of the Trading Defendants knew or could have known that Abercrombie's Second Quarter results would fall short of analyst expectations until after they traded. (Report at 120, *et seq*.) Based on its investigation, the SLC concluded that the evidence did not support a claim for insider trading under Delaware law, and accordingly determined that it was not in Abercrombie's best interests to pursue the claim.

The Court finds that, based on the foregoing and the SLC Report as a whole, the SLC had reasonable, factual bases for each of its conclusions.[8]

## IV.

The Court finds that the SLC was independent and fully authorized to investigate Plaintiffs' claims without Board interference, that it discharged its duties thoroughly and in good

---

[8] The Court reiterates that, in accordance with *Zapata* and its progeny, it has not considered the merits of Plaintiffs' claims, and expresses no opinion as to the merits of Plaintiffs' causes of action.

faith, and that its conclusions were well-reasoned and based in fact. The Court finds no cause to conduct the second step of *Zapata* by applying its own business judgment to analyze Plaintiffs' claims independently, and declines to exercise its discretion to do so.

Nominal Defendant Abercrombie's Motion to Dismiss the Derivative Complaint (doc. 120) is hereby GRANTED, and this case is DISMISSED. The Clerk is DIRECTED to enter judgment in favor of Defendant Abercrombie & Fitch Co.

This Opinion and Order will be filed under seal, and will remain under seal for a period of 14 days from the date entered. In that time, either party may move the Court to redact certain portions of the Opinion before it is made available to the public. (*See* doc. 118, granting Motion to Seal under Local Rule 79.3 and *In re Perrigo Co.*, 128 F.3d 430 (6th Cir. 1997)).

**IT IS SO ORDERED.**

$3-12-2009$
**Date**

**Edmund A. Sargus, Jr.**
**United States District Judge**