# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**ROBERT ROSS, et al.,**
**Plaintiffs**

**v.**

**ABERCROMBIE & FITCH**
**COMPANY, ET AL.,**
**Defendants**

**Case No. 2:05-cv-00819**
**(Lead Case)**

**JUDGE EDMUND A. SARGUS, JR.**
**MAGISTRATE JUDGE TERENCE P. KEMP**

## OPINION AND ORDER

City of Dearborn Heights Act of 345 Police and Fire Retirement System ("Plaintiff")

filed this action on behalf of itself and all persons who purchased the publicly traded securities of

Defendant Abercrombie & Fitch Company ("Abercrombie") from June 2, 2005 through August

16, 2005 (the "Class Period"). The action was brought against Abercrombie and its senior

officers, Michael S. Jeffries, Robert S. Singer, David L. Leino, Diane Chang, and Lesle K.

O'Neill; and contains three causes of action:

    (i)    alleged violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange

           Act") and Securities and Exchange Commission ("SEC") Rule 10b-5, 15 U.S.C.

           § 78j(b) and 17 C.F.R. § 240.10b-5;

    (ii)    alleged violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and

    (iii)    alleged insider trading under § 20A of the Exchange Act, 15 U.S.C. § 78t-1(a).

This matter is before the Court on Plaintiff's October 26, 2007 motion for class

certification under Fed. R. Civ. P. 23(b)(3). Plaintiff seeks to certify a plaintiff class of all

persons who purchased or otherwise acquired the publicly traded securities of Abercrombie

during the Class Period and were damaged thereby. Plaintiff also seeks appointment as a

designated Class Representative and asks the Court to appoint the law firm of Coughlin Stoia

Geller Rudman & Robbins LLP ("Coughlin Stoia") as Lead Class Counsel and the law firm of Murray Murphy Moul + Basil LLP ("Murray Murphy") as Liaison Class Counsel.

Plaintiff contends that Defendants issued misleading information while concealing negative information from June 2, 2005 through August 16, 2005, which artificially inflated the market price of Abercrombie stock, in violation of § 10(b) of the Exchange Act and SEC Rule 10b-5. According to Plaintiff, class members, relying on the integrity of the market, purchased stock at artificially inflated prices and were damaged when Defendants' alleged misrepresentations or omissions were disclosed and the value of Abercrombie stock declined.

Plaintiff asserts that the requirements of Rule 23 are satisfied, and the class should be certified, because (1) the claims of the entire class are based on the same legal theories and will be proven by the same evidence, (2) individual actions would be impracticable, (3) class certification is particularly well-suited to securities fraud cases, and (4) Plaintiff and counsel have demonstrated their adequacy through prosecution of the claims to date.

Defendants oppose class certification, contending that Plaintiff is subject to unique defenses, has not proven loss causation, and has proposed a putative class which is overbroad.

For the reasons set forth below, Plaintiff's motion for class certification is **GRANTED**.

## I. Background

### A. Allegations

A detailed description of the allegations in this matter are contained in this Court's August 9, 2007 Opinion and Order denying Defendants' motion for summary judgment. *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1107–16. To summarize, the Amended Complaint alleges that during the Class Period, Defendants misrepresented Abercrombie's financial performance by reporting very strong sales on a monthly basis from May to July 2005.

2

Plaintiffs claim that Defendants concealed Abercrombie's gross margin decline and falsely assured the investment community that denim sales were strong and increasing dramatically. According to Plaintiffs, in reality, from May to July 2005, Abercrombie had excess inventories of denim and other products. This allegedly caused Abercrombie to take drastic measures to sell the inventory, which in turn reduced the company's gross margins. Plaintiffs claim that, during the class period, Abercrombie stock traded at artificially high levels based on the allegedly misleading information provided to the investment community. During this time, the individual Defendants sold 1.9 million of their own shares for a profit of $137 million. On August 16, 2005, Defendants reported that Abercrombie's gross margin declined 180 basis points (1.8%) in the second quarter of fiscal year 2005 from the second quarter of fiscal year 2004. Abercrombie's stock price fell to $56.65 from a class period high of $74.10. *Id.*

## B.    Class Definition

Plaintiff seeks to represent a class of investors with the following proposed class definition: "all persons who purchased or otherwise acquired the publicly traded securities of Abercrombie & Fitch Co. ('Abercrombie' or the 'Company') between June 2, 2005 through August 16, 2005 (the 'Class Period'), and were damaged thereby." (Pl.'s Mot. 1.)

According to the Amended Complaint, the class members purchased shares at prices that were artificially inflated by the misrepresentations publicly disseminated about Abercrombie, and suffered damages when shares of Abercrombie declined in value when "the truth . . . came out." (Am. Compl. ¶¶130–35; Mot. 5.)

3

## C.    Cause of Action

### *1.    Section 10(b) and Rule 10b-5*

Plaintiffs assert that Defendants violated § 10(b) of the Exchange Act and accompanying

SEC Rule 10b-5. (Am. Compl. ¶¶ 144–51 (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5).)

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security

. . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for

the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 makes the following unlawful in

connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

In order to prevail on a claim of securities fraud under Section 10(b) and Rule 10b-5, a

plaintiff must establish the following elements: (1) a material misrepresentation or omission; (2)

scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security;

(4) reliance, often referred to as "transaction causation" in cases involving public securities

markets ("fraud on the market" cases); (5) economic loss; and (6) "loss causation," i.e., a causal

connection between the material misrepresentation and the loss. *Dura Pharms., Inc. v. Broudo*,

544 U.S. 336, 341–42 (2005) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 248–49

(1988); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 199 (1976); *Blue Chip Stamps v. Manor

Drug Stores*, 421 U.S. 723, 730–31 (1975); 15 U.S.C. § 78u-4(b)(4); T. HAZEN, LAW OF

SECURITIES REGULATION §§ 12.11[1], [3] (5th ed. 2005)); *Hoffman v. Comshare, Inc.* (*In re Comshare, Inc. Sec. Litig.*), 183 F.3d 542, 548 (6th Cir. 1999).

In some cases, the element of reliance can be presumed under the "fraud on the market theory." This is discussed further below as part of the Court's analysis of the predominance requirement under Rule 23.

### 2. *Sections 20(a) and 20A*

Plaintiffs also assert that the individual defendants are liable under §§ 20(a) and 20A of the Exchange Act. Section 20(a) imposes legal responsibility on a "controlling person" in a company for Rule 10b-5 violations. The statute provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Section 20A imposes liability on persons who engage in "insider trading." The statute provides:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a). Both sections 20(a) and 20A require a predicate violation of the securities laws or the rules and regulations promulgated thereunder. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696–97, 91 Fed. Appx. 418 (6th Cir. 2004).

## II.     Standard for Class Certification

### A.     Rule 23

Certification of class actions is controlled by Federal Rule of Civil Procedure 23. The

party seeking class certification bears the burden of proof. *In re Am. Med. Sys.*, 75 F.3d 1069,

1079 (6th Cir. 1996). To meet this burden, Plaintiff must show that all four of the prerequisites of

Rule 23(a) are satisfied. *See id.* These prerequisites are often referred to as the numerosity,

commonality, typicality, and adequacy of representation requirements. In addition to showing

that these requirements are satisfied, Plaintiff must demonstrate that the action falls within at

least one of the subcategories of Rule 23(b). *Id.* These requirements are discussed more fully

below.

### B.     Rigorous Analysis; Avoiding the Merits

An action is not maintainable as a class action merely because it is designated as such in

the pleadings. *Cash v. Swifton Land Corp.*, 434 F.2d 569, 571 (6th Cir. 1970) (citing 3B MOORE,

FEDERAL PRACTICE, ¶¶ 23.02-2, 230.5 (2d ed. 1969)). Nor is it sufficient merely to recite the

language of Rule 23(a). *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974).

Rather, "there must be an adequate statement of the basic facts to indicate that each requirement

of the rule is fulfilled." *Id.* Defendants are correct that the Court must "conduct a 'rigorous

analysis' into whether the prerequisites of Rule 23 are met before certifying a class." (Defs.'

Mem. Opp'n 4 (quoting *Am. Med. Sys.*, 75 F.3d at 1078–79 (quoting *Gen. Tel. Co. of the Sw. v.

Falcon*, 457 U.S. 147, 161 (1982))).)

While the Court must conduct a rigorous analysis, however, it may not pass judgment on

the merits of the case. Defendants cite several cases in which various courts outside the Sixth

Circuit have held that a district court should inquire into the merits to the extent that the merits

overlap Rule 23 considerations.[1] (Defs.' Mem. Opp'n 5–6, n.2 (citing *In re New Motor Vehicles Can. Exp. Antitrust Litig. (Brown v. Am. Honda)*, 522 F.3d 6, 17 (1st Cir. 2008); *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *Blades v. Monsanto Co.*, 400 F.3d 562, 566–67 (8th Cir. 2005); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)).)

Supreme Court and Sixth Circuit law, however, do not allow the Court to inquire into the merits at the class certification stage. The Supreme Court has held: "We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974). This holding does not conflict with a rigorous analysis at the class certification stage. However, the Court's rigorous analysis must be limited to the substance and structure of Plaintiff's claims, rather than an inquiry into the merits. As the Sixth Circuit has stated, the Court should "look beyond the pleadings . . . to determine what type of evidence will be presented by the parties" and "take care to inquire into the substance and structure of the underlying claims without passing judgment on their merits." *Rodney v. Nw. Airlines, Inc.*, 146 Fed. Appx. 783, 785–86 (6th Cir. 2005) (emphasis added); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006) (holding that the court should not conduct a preliminary inquiry into the merits; noting that "whether the class members can win on the merits of the issue common to the class is not a factor in determining whether [the lead plaintiff's] claim is typical"); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007); *Bacon v. Honda of Am. Mfg., Inc.*, 205

---

[1] In its analysis of the predominance requirement under Rule 23(b)(3), below, the Court will discuss *Oscar Private Equity Invs. v. Allegiance Telecom*, 487 F.3d 261 (5th Cir. 2007), a case in which the Fifth Circuit reached the merits of the element of loss causation at the class certification stage. As discussed below, however, this Court is bound to follow Sixth Circuit law, and must avoid adjudicating the merits of Plaintiff's claims.

7

F.R.D. 466, 476 (S.D. Ohio 2001) (holding that the court "may probe behind the pleadings" to analyze the Rule 23 prerequisites but "must not delve into the merits"). The Court has broad discretion in deciding whether to certify a class; however, that discretion must be exercised within the framework of Rule 23. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981); *see also Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200–01 (6th Cir. 1974).

For example, to determine whether Plaintiff can satisfy the Rule 23(b)(3) predominance requirement, the Court must "'consider how a trial on the merits would be conducted if a class were certified.' Though <u>not a determination on the merits</u>, the Rule 23(b)(3) analysis helps 'prevent . . . the class from degenerating into a series of individual trials.'" *Rodney*, 146 Fed. Appx. at 786 (quoting *Bell Atlantic Corp. v. Rochelle Commc'ns Inc.*, 339 F.3d 294, 302 (5th Cir. 2003)) (emphasis added).

## III.   Discussion

The Court will first discuss the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Then, because Plaintiff seeks certification under Rule 23(b)(3), it will discuss the two requirements of that section: predominance of common questions and superiority of the class action over other available methods for fairly and efficiently adjudicating the controversy. Finally, the Court will discuss Defendant's assertion that the proposed class definition is overbroad.

### A.   Requirements of Rule 23(a)

Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately

protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a). Plaintiff contends that it has satisfied all four of these requirements. Defendants primarily focus on the typicality and adequacy of representation requirements of Rule 23(a), which they contend are not satisfied in this case.

## *1.    Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no bright line numerical test by which the district court can determine when the numerosity requirement is satisfied, and the Sixth Circuit has noted that a class action does not require any specific number of members: "Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir. 1976) (citing *Cash*, 434 F.2d at 571). When class size reaches substantial proportions, however, the numerosity requirement is usually satisfied by the numbers alone. *Am. Med. Sys.*, 75 F.3d at 1079.

The numerosity requirement "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981); *Somerville v. Major Exploration, Inc.*, 102 F.R.D. 500, 503 (S.D.N.Y. 1984); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 479 (W.D. Mich. 1994); *Weinberg v. Insituform Techs., Inc.*, No. 93-2742 G/BRO, 1995 U.S. Dist. LEXIS 5124, *5–6; Fed. Sec. L. Rep. (CCH) P98,723; 1995 WL 368002 (W.D. Tenn. April 10, 1995).

Plaintiff makes the following allegations relevant to numerosity. During the Class Period, Abercrombie traded on the New York Stock Exchange ("NYSE"), a recognized efficient market. The daily trading volume of Abercrombie's stock was substantial, with hundreds of thousands of

9

shares traded each day. During the Class Period, Abercrombie's average daily trading volume was 1,804,232. (Am. Compl. ¶¶ 134, 136, 137).) In its Motion, Plaintiff represents and Defendants do not dispute that Abercrombie had approximately 86 million to 99 million common shares outstanding as of the dates the company filed its annual reports with the SEC in 2002 through 2005. (Pl.'s Mot. 8.) Plaintiff asserts that a "reasonable inference from these facts is the Class consists of more than a thousand investors." (Pl.'s Mot. 8.)

The Court is satisfied that joinder of all members is impracticable and that the numerosity requirement is satisfied.

### 2. *Commonality*

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The claims of the potential class members need not be factually identical. *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 608 (S.D. Oh. 2003) (citing *Putnam v. Davies*, 169 F.R.D. 89, 93 (S.D. Ohio 1996)). Rather, "the commonality requirement will be satisfied as long as the members of the class have allegedly been affected by a general policy of the Defendant and the general policy is the focus of the litigation." *Id.* (citing *Putnam*, 169 F.R.D. at 93; *Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576, 580 (S.D. Ohio 1993)). Although Rule 23(a)(2) speaks of "questions" in the plural, there need be only one question common to the class. *Bovee*, 216 F.R.D. at 608 (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)). The mere fact that questions peculiar to individual class members could remain does not necessarily defeat a finding of commonality. *Id.* (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Bacon v. Honda of America Mfg., Inc.*, 205 F.R.D. 466, 476 (S.D. Ohio 2001)).

10

Conclusory allegations of commonality are insufficient to satisfy the burden of proof on certification. *Bovee*, 216 F.R.D. at 608 (citing *Falcon*, 457 U.S. at 157; *Am. Med. Sys.*, 75 F.3d at 1081). The class representatives must enumerate questions of law or fact common to the class, "the resolution of which will advance the litigation." *Id.* (quoting *Sprague*, 133 F.3d at 397).

Plaintiff asserts that the Complaint describes a common course of conduct, specifically, that Defendants made uniform misrepresentations and omissions to the investing public in their SEC filings and press releases. These misrepresentations and omissions, Plaintiff submits, artificially inflated the market price of Abercrombie stock, thereby injuring each class member in exactly the same way. (Pl.'s Mot. 9.) The Amended Complaint identifies the following common questions of law or fact:

(a) Whether the federal securities laws were violated by [D]efendants' acts and omissions alleged [in the Amended Complaint];

(b) Whether [D]efendants omitted and/or misrepresented material facts;

(c) Whether the documents, reports, filings, releases and statements disseminated to the public by [D]efendants during the Class Period omitted and/or misrepresented material facts about the business, performance and financial condition of Abercrombie;

(d) Whether [D]efendants acted knowingly or reckless[ly] in misrepresenting or omitting material facts;

(e) Whether the market price of Abercrombie common stock during the Class Period was artificially inflated due to the omissions and misrepresentations complained of [in the Amended Complaint]; and

(f) Whether [P]laintiff and other members of the Class have sustained damages and, if so, the appropriate measure thereof.

(Am. Compl., ¶ 140.)

The Court finds that the issues identified by Plaintiff are common to the claims of the class. These questions closely mirror those identified in other cases in which courts have found

the commonality requirement "easily" satisfied. *Bovee*, 216 F.R.D. at 608–09 (citing *O'Neil v. Appel*, 165 F.R.D. 479, 491 (W.D. Mich. 1995); *Ballan*, 159 F.R.D. at 479; *Yadlosky v. Grant Thornton L.L.P.*, 197 F.R.D. 292, 298 (E.D. Mich. 2000); *In re Intelcom Group, Inc. Sec. Litig.*, 169 F.R.D. 142, 148 (D. Colo. 1996); *Tapken v. Brown*, 1992 U.S. Dist. LEXIS 11744, *85–86, 1992 WL 178984, *27–28, No. 90-691 (S.D. Fla. March 13, 1992)).

Questions of misrepresentation, materiality, and scienter are the "paradigmatic common question[s] of law in a securities fraud class action." *Bovee*, 216 F.R.D. at 609 (quoting *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 372 (D. Del. 1990)). As Plaintiff points out, if absent class members pursued their claims individually, they "would have to prove similar or identical facts and address similar or identical legal issues . . . and [D]efendants would raise the same defenses." (Pl.'s Mot. 10.)

The Court finds that Plaintiff has satisfied the commonality requirement.

### 3.   *Typicality*

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Am. Med. Sys.*, 75 F.3d at 1082 (citing 1 NEWBERG § 3-13, at 3-76). Typicality requires that the "representative's interests [are] aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* Stated differently, as the Sixth Circuit has summarized, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399; *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). "[T]he typicality requirement is not satisfied when a plaintiff can prove his own

12

claim but not 'necessarily have proved anybody else's claim.'" *Beattie*, 511 F.3d at 561 (citing *Sprague*, 133 F.3d at 399).

The typicality requirement focuses on the type of injury suffered by the class members and the interests of the various class members. *Bovee*, 216 F.R.D. at 609 (citing *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 64 (S.D. Ohio 1991)). The commonality and typicality requirements are closely related because they both help determine whether the claim of the named plaintiff and those of the class are so interrelated that the interests of the absent class members will be protected. *Id.*

Like the commonality requirement, the named plaintiff's claims do not have to be identical to the claims and defenses of the other members of the putative class, and need not always involve the same facts or law, provided there is a common element of fact or law. *Beattie*, 511 F.3d at 561 (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976)); *Putnam*, 169 F.R.D. at 94.

Plaintiff asserts that its claims are "typical, if not identical, to the claims of the other Class members" because its claims and the claims of the absent class members are based upon the same theories and will be proven by the same evidence. Plaintiff alleges Defendants violated §§ 10(b), 20(a), and 20A of the Exchange Act, as well as Rule 10b-5, by making material omissions and misrepresentations. Plaintiff alleges that it and other class members paid artificially inflated prices for Abercrombie securities and were damaged when the "truth came out" resulting in the removal of the artificial inflation. (Pl.'s Mot. 11; Am. Compl. ¶¶ 144–67.)

Defendants respond that Plaintiff has not satisfied the typicality requirement of Rule 23(a)(3) due to Defendants' unique defenses against Plaintiff's claims. (Defs.' Mem. Opp'n 14–24.) Defendants' asserted defenses are discussed below.

13

### (a)    **Timing of Purchase**

Defendants contend that Plaintiff cannot satisfy the typicality requirement due to the timing of Plaintiff's purchases of Abercrombie stock. Defendants assert that, due to that timing, Plaintiff is subject to the unique defense of a lack of individual standing and has not suffered the same injury as certain other class members. (Defs.' Mem. Opp'n 15–17.) The Court will first discuss Plaintiff's standing and then will address whether Plaintiff has suffered the same injury as the other class members.

#### (a)(1)  Standing

Defendants' first point relates to Abercrombie's earnings per share ("EPS") for the second quarter of 2005. Defendants submit that Plaintiff lacks standing because it purchased all of its Abercrombie shares when analyst consensus estimates of EPS ("consensus EPS") did not exceed Abercrombie's actual EPS results ("actual EPS"). Defendants claim that "the linchpin of [P]laintiff's claim is that [Abercrombie] did not advise investors that [it] would not meet [consensus EPS]." Thus, as Defendants contend, a person who purchased securities at a time when consensus EPS did not exceed actual EPS would not be misled by Defendants' conduct. (Defs.' Mem. Opp'n 15–16.)

Defendants point out that Plaintiff's motion "offers no evidence as to the changes in the consensus [EPS] during the course of the putative class period." (Defs.' Mem. Opp'n 15.) According to Defendants' expert, Professor Barry, from June 2 to July 7, 2005, the time during which Plaintiff purchased Abercrombie securities, the consensus EPS was below Abercrombie's actual EPS of $0.63 per share. Thus, Defendants assert, Plaintiff cannot allege that the market was misled during that time, and Plaintiff cannot allege that it was injured by Abercrombie's conduct. (*Id.* at 15–16.) As a result, Defendants assert Plaintiff is not an adequate class

14

representative and that Plaintiff's claim is not typical of the claims of investors who bought Abercrombie stock at times when consensus EPS exceeded actual EPS. (*Id.* at 16–17.)

Plaintiff disputes Defendants' expert's findings regarding consensus EPS. (Pl.'s Reply 9–10.) However, even if Plaintiff purchased its shares when consensus EPS did not exceed actual EPS, Plaintiff may prove that the stock price was artificially inflated at that time and that Plaintiff was damaged when the inflation was removed. Contrary to Defendants' assertions, EPS is not the "linchpin" of Plaintiff's claim; Plaintiff in fact makes other allegations of fraud including those relating to gross margin, excess inventory, and departure from an established policy against discounting. (Am. Compl. ¶ 2.) Considering Plaintiff's various claims, keeping in mind that this Court has already held that Plaintiff has stated a claim for which relief can be granted,[2] and adhering to the requirement that the Court not inquire into the merits of Plaintiff's claims, the Court finds that Defendants' EPS-related evidence does not threaten Plaintiff's standing.

### (a)(2)  Common Injury

As Defendants note, in order to satisfy the typicality requirement, Plaintiff must "'possess the same interest and suffer the same injury' as the class members." (Defs.' Mem. Opp'n 16–17 (citing *E. Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403 (1977)).) Defendants assert that "there is a material distinction between [P]laintiff's claims and those of investors who bought _after_ the consensus estimate exceeded $0.63 per share." (*Id.* at 17.)

The Court disagrees. Differences in the timing of stock purchases by class representatives do not make their claims atypical if plaintiffs allege a common scheme of misrepresentation. *Bovee*, 216 F.R.D. at 610. For example, "'[w]hen a named plaintiff alleges a common course of

---

[2] On August 9, 2007, this Court denied Defendants' motion for summary judgment under Civil Rule 12(b)(6). (Document 107.)

conduct in a securities class action," the timing of that plaintiff's purchases during the Class

Period "does not vitiate his suitability as a class representative.'" *Id.* (citing *Katz v. Comdisco,*

*Inc.*, 117 F.R.D. 403, 411 (N.D. Ill. 1987); *In re Consumers Power Co. Secs. Litig.*, 105 F.R.D.

583, 608 (E.D. Mich. 1985) ("Late purchasers have a special incentive to prove the case of the

earlier purchases, because this helps them establish defendants' liability in their own cases.");

*Fox v. Equimark Corp.*, Fed. Sec. L. Rep. (CCH) P98,384, No. 90-1504, 1994 WL 560994, *4

(W.D. Pa. July 18, 1994) ("All purchasers of stock during a class period share a common interest

in showing that the stock was unlawfully inflated.")). As one commentator noted:

> Defendants in securities class actions have often argued that a plaintiff's claim
> cannot be typical of the claims of class members who purchased at different
> times in reliance on different documents. It is now settled, however, that the
> claims of such a plaintiff are typical of the claims of the class if all the
> documents relied upon are part of a common course of conduct or common
> scheme to defraud.

7 NEWBERG ON CLASS ACTIONS § 22.26 (4th ed. 2002) (hereinafter "NEWBERG"); *accord Stoller*

*v. Baldwin-United Corp., et al.*, 1985 U.S. Dist. LEXIS 19241, *45–46, 1985 WL 5809, *16, No.

1-82-1438, (S.D. Ohio June 4, 1985).

Here, Plaintiff alleges a common course of conduct by Defendants. Plaintiff alleges that

Defendants misrepresented Abercrombie's financial performance by reporting strong sales while

concealing the company's gross margin decline, excess inventories, and increasing markdowns.

According to Plaintiff, these alleged misrepresentations artificially inflated the price of

Abercrombie stock. "Normally when a complaint alleges an essential continuity of omissions or

material representations, the claim of the class representative is considered typical for the class

for the entire period from the date of the first objectionable report to the date of the full

disclosure." 7 NEWBERG § 22.26. Such is the case here.

### (b)    **Alleged Contradictions**

Defendants variously assert that the typicality and adequacy requirements are not satisfied because the facts "squarely contradict the allegations and theory of the Complaint." (Defs.' Mem. Opp'n 20, 31.) Defendants point to (1) Plaintiff's stock purchases while consensus EPS was allegedly lower than Abercrombie's actual EPS, (2) Plaintiff's purchase of Abercrombie stock six days after the August 16, 2005 disclosures, (3) Plaintiff's investment advisor's testimony that it found "no evidence of markdowns" and did not believe that Abercrombie had engaged in any fraud, and (4) Plaintiff's alleged lack of involvement in the purchase decision. Defendants ask the Court to compare those facts to Plaintiff's allegations regarding EPS and allegation that Plaintiff and the other class members "would not have purchased Abercrombie stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by [D]efendants' misleading statements and concealment." (*Id.* at 19–21, 31–34 (citing Am. Compl. ¶ 165).)

### (b)(1)    **Purchase at Time of Low Consensus EPS**

Defendants suggest that the timing of Plaintiff's stock purchases contradicts Plaintiff's allegations regarding EPS. (Defs.' Mem. Opp'n 31.) As discussed above, however, EPS is not the "linchpin" of Plaintiff's case, and the timing of Plaintiff's purchases is not inconsistent with the allegations.

### (b)(2)    **Purchase After the Class Period**

Defendants also point to Plaintiff's purchase of stock six days after the Class Period. The Court finds this purchase to be irrelevant. It is not inconsistent with the pleadings for Plaintiff to have purchased stock after its price had been deflated by curative disclosures. As Plaintiff points out in its Reply, a party may believe a stock to be a bargain after such deflation, and may believe

17

that it is "now trading at a price with [D]efendants' fraud removed from it." (Pl.'s Reply 13.) *See In re Rent-Way Secs. Litig.*, 218 F.R.D. 101, 114 (W.D. Pa. 2003) (finding post-class period purchases "irrelevant to the instant litigation"); *but see In re Cardinal Health, Inc. Secs. Litig.*, 226 F.R.D. 298, 310 (S.D. Oh. 2007) (finding that where the plaintiff "began buying Cardinal [stock] at almost exactly the same time that Cardinal Health began to disclose publicly the ongoing investigations," the plaintiff's "trading patterns will make it susceptible to claims that [it] did not rely on the Defendants' alleged misrepresentations when purchasing Cardinal stock); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 481 (W.D. Mich. 1994) (finding the plaintiff atypical where he purchased shares <u>at the same price</u> both during and shortly after the class period).

### (b)(3)  CCI Testimony

According to Defendants, the reasons that Columbus Circle Investors ("CCI"), Plaintiff's investment advisor, purchased Abercrombie stock on Plaintiff's behalf are inconsistent with Plaintiff's allegations. (Defs.' Mem. Opp'n 31.) The Court disagrees. Certain factors, such as approval of Abercrombie's in-store spending, may have influenced CCI's decision to purchase stock on Plaintiff's behalf. (*Id.*) This fact does not contradict Plaintiff's allegations that it purchased the stock without knowledge of the alleged fraud, and would not have bought the stock at that price had it known the truth. Defendants also point to CCI's belief that there was "no evidence of discounting" by Abercrombie. (*Id.* (citing Fox Dep., Ex. 15).) While this is inconsistent with the allegations of discounting, it does not help Defendants—because it is also inconsistent with Defendants' own admission of increased markdowns. (*See* Am. Compl. ¶ 91; Answer to Am. Compl. ¶ 91 (citing Abercrombie & Fitch Co., Current Report (Form 8-K), at Ex. 99.2 (Aug. 19, 2005) (transcript of Aug. 16, 2005 conference call)).) In fact, while CCI's

testimony is inconsistent with allegations of discounting, it is consistent with the theory that the stock purchase was made without knowledge of discounting.

### (b)(4)  Plaintiff's Alleged Lack of Participation

Plaintiff's alleged lack of involvement in the purchase decision is discussed below as part of the Court's analysis of the adequacy of representation requirement. For the reasons discussed below, and because CCI acted as Plaintiff's agent in purchasing Abercrombie stock, CCI's involvement does not make Plaintiff atypical.

As discussed above, Defendants' purported "unique defenses" against Plaintiff do not destroy typicality in this case. Accordingly, the Court finds that the claims of the class representatives are typical of those of the class.

### 4.  *Adequacy of Representation*

Rule 23(a)(4) permits certification if "the representative parties will fairly and adequately protect the interests of the class." This requirement is essential to due process because a final judgment in a class action is binding on all class members. *Am. Med. Sys.*, 75 F.3d at 1083 (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)). The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Beattie*, 511 F.3d at 562 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)).

In *Senter*, the Sixth Circuit articulated two criteria for determining the adequacy of representation: (a) "[t]he representative must have common interests with unnamed members of the class" and (b) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter*, 532 F.2d at 525.

19

### (a)    **Common Interests**

The first requirement overlaps with the commonality and typicality requirements and acts

to ensure that the representative have interests co-extensive with, rather than antagonistic to, the

interests of the other class members. *Day v. NLO, Inc.*, 144 F.R.D. 330, 335 (S.D. Oh. 1992). A

plaintiff may not be an adequate representative if that plaintiff is subject to unique defenses that

place it in a position that is antagonistic to the interests of the class. *Reeb v. Ohio Dep't of Rehab.*

*& Corr. Belmont Corr. Inst.*, 203 F.R.D. 315, 322 (citing *Levels v. Akzo Nobel Salt, Inc.*, 178

F.R.D. 171, 179 (N.D. Ohio 1998)).

Plaintiff asserts that its interests are "neither antagonistic to, nor in conflict with, the

interests of the other Class members" and points out that the entire class, including Plaintiff,

"sustained losses as a result of the same alleged material misrepresentations and omissions."

(Pl.'s Mot. 12.) Plaintiff states that in prosecuting its own claims to achieve maximum recovery,

it will vigorously prosecute other class members' claims. (*Id.*) Plaintiff claims that this is

sufficient under Rule 23, noting that "[s]o long as all class members are united in asserting a

common right, such as achieving the maximum possible recovery for the class, the class interests

are not antagonistic for representation purposes." (*Id.*, quoting *In re Corrugated Container*

*Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981).)

Defendants contend that Plaintiff does not meet this requirement due to Defendants'

potential unique defenses against Plaintiff's claims, including (1) alleged contradictions between

the allegations and the circumstances of Plaintiff's stock purchases and (2) Plaintiff's alleged

### (a)(1)    **Alleged Contradictions**

As discussed in the above analysis of typicality, Defendants assert that Plaintiff is not an

adequate representative due to alleged contradictions between Plaintiff's allegations and certain

20

circumstances of Plaintiff's purchase of Abercrombie stock. For the same reasons discussed above, the Court finds that the alleged contradictions do not defeat the adequacy of representation requirement.

### (a)(2)  Purchaser Standing

#### *(a)(2)(a)*  *Allegations*

Defendants claim Plaintiff is not an adequate class representative because Plaintiff is not a "purchaser" of securities and therefore lacks standing to bring a Section 10(b) claim. (Defs.' Mem. Opp'n 21–24 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)).) Defendants assert that Plaintiff is not a purchaser because Plaintiff "had no involvement whatsoever in the decisions to buy, and later sell, [Abercrombie] stock," decisions which "were made exclusively by Columbus Circle Investors ('CCI'), an investment firm." Defendants allege that "[P]laintiff ceded all rights and powers related to the purchases and sales of stock to CCI and had no involvement whatsoever in the investment decisionmaking process generally, or in the decisions to purchase and sell [Abercrombie] shares specifically." (Defs.' Mem. Opp'n 11, 21 (citing Riley Dep. 80–82, 134–35, 141, 181–86, Ex. 1; Fox Dep. at 63–66, 142–53).) Defendants assert that Plaintiff lacks standing because only "those who actually purchase or sell a particular security" may bring a 10(b) claim. (Defs.' Mem. Opp'n 22 (citing *Blue Chip Stamps*, 421 U.S. at 731).) Because Plaintiff lacks standing, Defendants contend, Plaintiff is not an adequate representative under Rule 23(a)(4).

Plaintiff counters that it "did not abdicate all control over investments to CCI," but rather "actively participated in how the money . . . was invested and limited CCI's discretion to invest." Plaintiff asserts that it "monitors and scrutinizes" its investment managers' performance to ensure that its investment objectives are being achieved and that the investment policy guidelines

21

are being followed. (Pl.'s Reply 14–15 (citing Riley Dep. (Ex. F) 33:8–34:3; 45:21–46:5; 59:4–60:14; 72:17–73:19; 77:18–80:4; 82:3–82:21; 103:15–104:7; 106:9–23).) According to Plaintiff, CCI's discretion to purchase or sell particular securities was limited by Plaintiff's investment guidelines, which prohibited CCI from making a number of investments. For example, the guidelines prohibited CCI from "making short sales; purchasing letter stock, private placements, direct payments, or securities that were not readily marketable; engaging in leveraged transactions; investing in commodities, puts, calls, straddles, or other option strategies, tax exempt securities or any other derivative not allowed by the guidelines or trustees." (*Id.* (citing Ex. G at PLTF 000030).) Plaintiff also asserts that it reviews its investment managers' performance quarterly and requires its investment managers to stay within particular asset classes. (*Id.* (citing Ex. F at 58:22–25, 121:10–122:15; 72:11–73:24; 82:3–83:2; 89:8–95:12).) Finally, Plaintiff states that it "retains the ultimate authority to instruct its investment manager to purchase or sell a particular security." (*Id.* (citing Ex. F at 121:10–122:15).)

### (a)(2)(b)  *Analysis*

Defendants correctly cite *Blue Chip Stamps* for the proposition that only actual purchasers may bring a claim under § 10(b). (Defs.' Mem. Opp'n 22.) The facts of *Blue Chip Stamps* are unrelated to the circumstances of this case, however, and its holding does not control the outcome of this matter. As recently stated by the Supreme Court, "*Blue Chip Stamps* . . . involved the very different question [of] whether the [Exchange] Act protects a person who did not actually buy securities, but who might have done so had the seller told the truth." *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 594 (2001) (holding that the *Blue Chip Stamps* rule does not apply to an oral agreement to purchase a stock option). In *Blue Chip Stamps*, the plaintiff simply had not purchased the securities at issue. Allegedly relying on the

22

defendant's fraud, the plaintiff did not purchase any securities, and later sued for "damages representing the lost opportunity to purchase" the shares. *Blue Chip Stamps*, 421 U.S. at 725–27. The *Blue Chip Stamps* Court held that the plaintiff was not entitled to sue for violation of Rule 10b-5, adopting a long-standing rule (the "*Birnbaum* rule") established by the Second Circuit in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952). *Blue Chip Stamps*, 421 U.S. at 755. The *Birnbaum* rule held that "the plaintiff class for purposes of a private damage action under § 10(b) and Rule 10b-5 was limited to actual purchasers and sellers of securities." *Blue Chip Stamps*, 421 U.S. at 730 (citing *Birnbaum*, 193 F.2d 461). There is no evidence that the Court intended or anticipated *Blue Chip Stamps* to preclude the claims of plaintiffs who rely upon professional investment advisors.[3]

The Sixth Circuit has not applied *Blue Chip Stamps* to a case similar to this matter. However, prior to the Supreme Court's decision in *Blue Chip Stamps*, the Sixth Circuit had applied the *Birnbaum* rule, which was later adopted by the Supreme Court in *Blue Chip Stamps*. Applying the *Birnbaum* rule, the Sixth Circuit nonetheless found purchaser standing where the plaintiff had no participation in the purchase decision, and in fact had no power to prevent the transaction. *James v. Gerber Prods. Co.*, 483 F.2d 944, 948 (6th Cir. 1973).[4]

---

[3] The Court in *Blue Chip Stamps* noted that "[t]hree principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule," including (1) those who decided not to purchase due to fraud; (2) shareholders who decided not to sell due to fraud; and (3) shareholders, creditors, and other related parties who suffered loss in their investment due to fraud. *Id.* at 737–38. Notably missing from the Court's list of barred plaintiffs is one who purchases or sells securities with the assistance of an investment advisor.

[4] The Court recognizes that other courts have given a broader interpretation of *Blue Chip Stamps. See Davidson v. Belcor, Inc.*, 933 F.2d 603 (7th Cir. 1991); *Congregation of the Passion v. Kidder Peabody & Co., Inc.*, 800 F.2d 177, 181 (7th Cir. 1986); *Weinberg v. Atlas Air Worldwide Holdings*, 216 F.R.D. 248, 255 (S.D.N.Y. 2003); *In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 108–09 (W.D. Pa. 2003); *In re Caremark Int'l Sec. Litig.*, 1996 U.S. Dist. LEXIS 8751, 1996 WL 351182, *19–20 (N.D. Ill. June 24, 1996); *Fry v. UAL Corp.*, 136 F.R.D. 626, 635 (N.D. Ill. 1991); *Harris Trust and Savings Bank v. Ellis*, 609 F. Supp. 1118 (N.D. Ill. 1985). This Court is unpersuaded by those cases and, further, views the Sixth Circuit's decision in *Gerber* as binding precedent. *Gerber*, 483 F.2d at 948 (requiring no participation in the purchase decision).

23

In *Gerber*, the Sixth Circuit answered in the affirmative "the difficult question as to whether a beneficiary of a testamentary trust from which securities are sold has proper standing to sue under Rule 10b-5." *Id.* at 945. The court read the existing case law, including *Birnbaum*, to conclude that where alleged fraud has "led . . . the shareholder into a completed transaction giving rise to a § 10(b) suit, the courts have generally inclined to a logical and flexible construction of the term 'purchaser-seller' . . . to accommodate the avowed purpose of § 10(b) of protecting the investing public and of ensuring honest dealings in securities transactions." *Id.* at 948. The court held that the trust beneficiary had standing under § 10(b), noting that the goals of Rule 10b-5 and the *Birnbaum* rule "are best promoted by providing standing" to the beneficiary. *Id.* at 948.

The court explained that as beneficiary, the plaintiff "was the person who was to be benefitted by the sale and thus she had the interests of a de facto seller. In this respect she is much closer to the transaction than the plaintiffs in the *Birnbaum* case . . . [who] were not involved to any extent in the sale of securities which were the subject of the complaint." *Id.* at 948–49.

The *Gerber* defendant contended that the court should limit the scope of private actions under Rule 10b-5 by distinguishing between the investor-trustee and the beneficiary. The Sixth Circuit rejected this "mere technical argument," explaining:

> We have difficulty with that argument for the reason that the trustee's interest in consummating the transactions at issue was to benefit the beneficiary. The very niceties of [the defendant's] legal distinctions may be misleading. The trustee's promotion of any interest other than the beneficiary's, such as its own, would be fraudulent. Therefore, as applies to these circumstances, separating the legal and beneficial incidents of ownership in the property is a mere technical argument since there is only one interest at stake and that is the beneficiary's.

*Gerber*, 483 F.2d at 949.

24

While *Blue Chip Stamps* requires a plaintiff to be a purchaser or seller, the decision does not require a high level of participation by the plaintiff in the purchase or sale decision. This reading of *Blue Chip Stamps* is consistent with the Sixth Circuit's decision in *Gerber* and case law that charges courts to read § 10(b) "flexibly, not technically and restrictively [so] that the statute provides a cause of action for any plaintiff who suffer[s] an injury as a result of deceptive practices touching its sale [or purchase] of securities." *Santa Fe Indus. v. Green*, 430 U.S. 462, 475–76 (1977) (quoting *Bankers Life*, 404 U.S. at 12–13) (internal quotation marks omitted).

As one court recently noted, one of the purposes of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, was to encourage institutional investors to oversee more securities actions:

> If an institutional investor cannot be a class representative simply because it turned over day-to-day investment decisions to professional money managers or advisors, few if any institutional investors could be class representatives in any securities action. Such a result is contrary to the intentions of Congress embodied in the PSLRA that institutional investors should oversee more securities actions.

*In re DVI Inc. Secs. Litig.*, 249 F.R.D. 196, 204–05 (E.D. Pa. 2008) (citing *In re Vircuron Pharms., Inc. Secs. Litig.*, 233 F.R.D. 421, 427 (E.D. Pa. 2006)). See also *See In re NeoPharm, Inc. Secs. Litig.*, 225 F.R.D. 563, 567–68 (N.D. Ill. 2004).

Even if *Blue Chip Stamps* required Plaintiff to have actively participated in the stock purchase, Plaintiff would satisfy this requirement. Plaintiff has provided evidence that it actively participated investment decisions, limited CCI's discretion to invest, and monitored and scrutinized CCI's performance for achievement of investment objectives and adherence to investment policy guidelines.

Accordingly, the Court finds that Plaintiff has satisfied the adequacy of representation requirement.

### (b)     Vigorous Prosecution

To satisfy the second requirement of the adequacy of representation requirement, it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Senter*, 532 F.2d at 525 (citing *Gonzales v. Cassidy*, 474 F.2d 67, 73 (6th Cir. 1973)). This means that Plaintiff must have sufficient financial and personal involvement to encourage it to prosecute the action vigorously, and adequate resources and legal representation to meet the demands of maintaining the action. *Day*, 144 F.R.D. at 335 (citing WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1767 (1986)). Further, class counsel must be qualified, experienced, and generally able to conduct the litigation. *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000).

Plaintiff asserts that "there is no question" that it "has prosecuted, and will continue to vigorously prosecute, the case and adequately represent the Class's interests." (Pl.'s Mot. 12.) Plaintiff further asserts that it has a significant financial incentive to achieve positive results for the class due to its significant investment in Abercrombie common stock, and resultant losses, during the Class Period. (*Id.*)

Plaintiff asserts that it and the proposed class counsel have established adequacy through their prosecution of the claims to date, zealously litigating the matter since August 2006, filing a 52-page complaint, prevailing on motions to dismiss, and vigorously pursuing discovery. (Pl.'s Mot. 3.) Plaintiff states that it has overseen the entirety of the litigation, supervising the case and maintaining constant contact with its counsel. (Pl.'s Mot. 3 (citing Riley Decl., attached as Ex. A to Andracchio Aff.).) Plaintiff states that it understands its fiduciary duty to all class members to provide fair and adequate representation and is dedicated to the case's prosecution, including preparing for and testifying at deposition and trial. (Pl.'s Mot. 4, 13.) Plaintiff contends that it

has demonstrated its willingness and ability to take an active role in and control the litigation to protect absent Class members' interests by: (1) receiving regular status reports from and participating in conference calls with Lead Counsel; (2) routinely consulting with counsel concerning significant developments in the litigation; (3) reviewing pleadings and other documents submitted in the case; and (4) participating in the discovery process. (Pl.'s Mot. 4, 12–13.)

Plaintiff also asserts that, by hiring the Coughlin Stoia firm, it has retained "experienced, able counsel" who have "successfully prosecuted securities class actions throughout the country and within this circuit." (Pl.'s Mot. 13.) Plaintiff also points out that the District Court for the Southern District of Texas has found the Coughlin Stoia firm to be "highly qualified, widely experienced in securities class actions, and competent to conduct litigation." (Pl.'s Mot. 13 (quoting *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, No. H-01-3624, 2006 U.S. Dist. Lexis 43146 (S.D. Tex. June 5, 2006).) Plaintiff adds that liaison counsel Murray Murphy is also qualified and experienced, and that the firms together have the resources necessary to vigorously represent the proposed class. (Pl.'s Mot. 13–14.)

Defendants respond that Plaintiff has a policy and practice of becoming involved in already-pending securities fraud cases identified by Plaintiff's attorneys. Plaintiff does not bear costs or expenses of such cases, instead requiring legal counsel to pay all costs and expenses of litigation. (Defs.' Mem. Opp'n 14, 32–33.) Defendants also assert that Plaintiff "has no apparent financial interest in ensuring accurate allegations and claims, because it pursues lead plaintiff status only on the agreement that it will never have to pay costs or expenses." According to Defendants, Plaintiff "clearly has not controlled the litigation" in this matter, allowing a Complaint containing the contradictions discussed above. (Defs.' Mem. Opp'n 33.)

27

The Court disagrees with Defendants. The alleged contradictions are not problematic for reasons already discussed. While Plaintiff's lack of obligation to pay costs and expenses does decrease Plaintiff's potential losses, it does not follow that Plaintiff has no financial interest in the successful prosecution of this case, considering Plaintiff's alleged investment and resultant losses.

A court may deny class certification when class representatives have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Bovee*, 216 F.R.D. at 615 (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995)). However, as stated by the Eleventh Circuit:

> [I]n securities cases . . . where the class is represented by competent and zealous counsel, class certification should not be denied simply because of a perceived lack of subjective interest on the part of the named plaintiffs unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case. To require less would permit attorneys essentially to serve as class representatives; to require more could well prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights.

*Id.* (citing *Kirkpatrick*, 827 F.2d at 727–28).

The Court finds that Plaintiff is an adequate class representative. It has vigorously prosecuted the interests of the class through qualified counsel and will likely continue to do so.

### B. Requirements of Rule 23(b)(3)

In addition to satisfying the prerequisites of Rule 23(a), Plaintiff must demonstrate that the action falls within one of the subcategories of Rule 23(b). Because Plaintiff seeks class certification under Rule 23(b)(3), Plaintiff must show that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members,"

and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether Plaintiff has made this showing, the Court may consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* According to the Advisory Committee comments to Rule 23, "Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

## 1.    *Predominance*

The Court must be satisfied that legal and factual issues common to all members of the class will predominate over individual issues. "The predominance test is not a numerical test and does not require the court to add up the common issues and the individual issues and determine which is greater." *Bovee*, 216 F.R.D. at 605 (citing *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 375 (D. Del. 1990)). "Rather, the court must determine whether the members of the class seek a remedy to a common legal grievance and whether the common questions of law and fact central to the litigation are common to all class members." *Id.*

The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem*, 521 U.S. at 625. Courts in the Sixth Circuit have also held that class certification is "particularly appropriate for [cases with] allegations of federal securities fraud." *In re Rospatch Secs. Litig.*, 1991 U.S. Dist. Lexis 10311, *6, Fed. Sec. L. Rep. (CCH) P96,160 (W.D. Mich. 1991 July 22, 1991).

Plaintiff contends that courts in the Sixth Circuit have found the predominance requirement to be satisfied where the questions include "whether defendants disseminated statements to the public that misrepresented material facts or omitted material facts; whether the stock price was artificially inflated due to defendants' alleged misrepresentations; and whether defendants acted with the requisite scienter with respect to plaintiffs' allegations of fraud." (Pl.'s Mot. 14 (quoting *Picard Chem. Profit Sharing Plan v. Perrigo Co.*, No. 1:95-CV-141, 1996 U.S. Dist. Lexis 16330, *35 (W.D. Mich. Sept. 27, 1996); *Herm v. Stafford*, 461 F. Supp. 508, 514 (W.D. Ky. 1978)).)

Plaintiff also asserts that predominance is usually decided on the question of liability. If liability issues are common to the Class, common questions are held to predominate over individual ones. (Pl.'s Mot. 15 (citing *Insituform Techs.*, 1995 U.S. Dist. LEXIS 5124 at *20–21; *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981)).)

Defendants contend that Plaintiff has not satisfied the predominance requirement of Rule 23(b)(3) due to (a) the circumstances of Plaintiff's purchase and sale of Abercrombie stock and (b) Plaintiff's alleged failure to establish loss causation, which Defendants claim makes the fraud on the market inapplicable. (Defs.' Mem. Opp'n 14–19, 24–30.)

### (a) Circumstances of Plaintiff's Purchase and Sale

As discussed above in relation to typicality, Defendants assert that the Plaintiff's purchase of Abercrombie stock occurred when the consensus EPS was below Abercrombie's actual EPS, while other class members presumably purchased stock when the consensus EPS exceeded the actual EPS. In a similar vein, relying on the changing nature of an EPS consensus estimate and on the timing of various disclosures during the Class Period, Defendants allege that "the claims of class members who purchased at different points during the class period will

require significantly different legal analysis." (Defs.' Mem. Opp'n 17 (emphasis in original).)
Defendants assert that "the changing [consensus EPS] fractures the class into differently situated
groups whose claims will involve different facts and different legal theories depending on the
[consensus EPS] on the date of purchase, the timing of [Abercrombie's] public statements, and
other factors." (*Id.* at 18–19.)

 For the reasons discussed in the Court's analysis of typicality, the various timing of
different class members' purchases does not defeat predominance of common issues. The
predominant issues in this case relate to the alleged common course of conduct establishing
Defendants' liability. While different class members will have varying issues relating to
damages, this is not enough to prevent class certification. "The traditional rule is that a plaintiff
class should be certified despite conflicts over damages issues between early and late sellers of
the stock." *Bovee*, 216 F.R.D. at 610 (quoting *Picard Chem.* at \*6; *Freedman v. Louisiana-
Pacific Corp.*, 922 F. Supp. 377, 400 (D. Or. 1996); *In re Mut. Sav. Bank Secs. Litig.*, 166 F.R.D.
377, 384 (E.D. Mich. 1996); *Welling v. Alexy*, 155 F.R.D. 654, 662 (N.D. Cal. 1994)) (internal
quotations omitted).

### (b)   Issues of Reliance: The Fraud on the Market Theory; Loss Causation

 Plaintiff submits that the question of reliance does not pose an obstacle to predominance
because Plaintiff relies on the "fraud on the market theory," explained below. (Pl.'s Mot. 15–16.)
When the fraud on the market theory is invoked, courts agree that the legal and factual issues
common to all members of the class will predominate over individual issues. *Bovee*, 216 F.R.D.
at 607 (citing *Castillo v. Envoy Corp.*, 206 F.R.D. 464, 473–74 (M.D. Tenn. 2002); *Powers v.
Stuart-James Co., Inc.*, 707 F. Supp. 499, 504 (M.D. Fla. 1989); *Basic*, 485 U.S. at 242).
Defendants counter that the fraud on the market theory is unavailable to Plaintiff because

Plaintiff has failed to prove loss causation. When the fraud on the market theory is unavailable, questions of individual reliance may predominate and make class certification inappropriate. *See Basic*, 485 U.S. at 242.

### (b)(1)  The Fraud on the Market Theory Generally

While reliance is an essential element of a Rule 10b-5 claim, it will be presumed when the fraud alleged is "fraud on the market." *Basic*, 485 U.S. at 247. According to the fraud on the market theory, an investor who buys or sells stock at the market price does so in reliance on the integrity of that price. Because the market price reflects most publicly available information, an investor's reliance on any public material misrepresentations may be presumed for purposes of a Rule 10b-5 action. *Id.* at 247; *Stavroff v. Meyo*, 1997 U.S. App. LEXIS 32774, *11 n.2 (6th Cir. 1997) (citing *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir. 1986); *Basic*, 485 U.S. at 227); *Castillo*, 206 F.R.D. at 468. A claim of fraud on the market rests on the assumption that in "an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value." *Peil v. Speiser*, 806 F.2d 1154, 1161 (3rd Cir. 1986).

In the Sixth Circuit, a plaintiff must allege the following to invoke the fraud on the market presumption of reliance:

> (1) that the defendants made public misrepresentations, (2) that the misrepresentations were material, (3) the stock was traded on an efficient market, (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock, and (5) that the plaintiff traded in the stock between the time the misrepresentations were made and the time the truth was revealed.

*Freeman*, 915 F.2d at 197–98 (citing *Basic*, 485 U.S. at 248 n.27). The presumption of reliance afforded by the fraud on the market theory is rebuttable. "Any showing that severs the link

between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248.

The fraud on the market theory is key to satisfying the predominance requirement in class certification of securities fraud cases. Without the benefit of the presumption of reliance, "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would [prevent plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Basic*, 485 U.S. at 242.

### (b)(2) <u>Availability of the Fraud on the Market Theory</u>

The Court is tasked to make a preliminary determination as to the availability of the fraud on the market theory to Plaintiff. *Bovee*, 216 F.R.D. at 606 (citing *Castillo*, 206 F.R.D. at 470–71; *Tapken v. Brown*, 1992 U.S. Dist. LEXIS 11744, No. 90-691-CIV-MARCUS, 1992 WL 178984, *27–28 (S.D. Fla. March 13, 1992)) ("a preliminary determination as to the 'availability' or applicability of the presumption [of reliance], which is distinct from its actual application, can be made at this stage without dealing with the merits of the case"). As discussed above, however, the Court cannot inquire into the merits of the claims pleaded.

Thus, this Court will limit its inquiry to a preliminary determination of whether the fraud on the market theory is available to Plaintiff. The Amended Complaint alleges that Defendants made material misrepresentations and omissions to the public; Abercrombie securities were traded in high volumes on the New York Stock Exchange; Abercrombie filed periodic reports with the SEC and communicated with investors via established market communication mechanisms; Abercrombie was followed by securities analysts; the alleged misrepresentations and omissions would induce a reasonable investor to misjudge the value of Abercrombie

securities; and Plaintiff and the other class members purchased Abercrombie common stock during the Class period without knowledge of the omitted or misrepresented facts. Am. Compl., ¶¶ 136, 148. These allegations are sufficient to invoke the fraud on the market presumption of reliance. *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197–98 (6th Cir. 1990).

### (b)(3)  Defendants' Assertions Regarding Loss Causation

Citing Fifth Circuit law, Defendant submits that Plaintiff cannot rely on the fraud on the market theory to satisfy the predominance requirement because Plaintiff has not proven loss causation. (Defs.' Mem. Opp'n 24–30 (citing *Oscar Private Equity Invs. v. Allegiance Telecom*, 487 F.3d 261 (5th Cir. 2007)).)

Defendants correctly state that loss causation is a basic element of Plaintiff's § 10(b) claim. (Defs.' Mem. Opp'n 24 (citing *Dura*, 544 U.S. at 341–42).) Defendants contend that, because other information was released the same day, Plaintiff cannot prove that any market reaction was caused by the alleged misrepresentations. To show that the August 17, 2005 stock price decline could have been caused by factors other than the alleged fraud, Defendants point to what analysts call "confounding information": same-day disclosures of information *other than* what was alleged in the Amended Complaint. Defendants point to the following confounding information: (1) lower-than-expected revised guidance for year-end EPS; (2) continued increases in in-store spending and increased capital expansion; and (3) continuing operating losses at Ruehl stores. (Defs.' Mem. Opp'n 29.)

Defendants' expert, Professor Barry, concluded that "the stock price reaction cannot solely be attributed to the allegations in the Complaint" due to the presence of confounding information. (Barry Report ¶ 32 (emphasis added).) Professor Barry explained that "[i]n the

34

presence of such confounding information, the academic literature discusses the difficulty of disentangling stock price effects of different types of news on an announcement day." (*Id.*)

On the other hand, Plaintiff's expert performed an event study, considered the alleged confounding information, and concluded that loss causation exists in this case. (Pl.'s Reply 24 (citing Ex. A at 97–137, 159–75).)

These matters, however, address the merits of Plaintiff's claims, and cannot be adjudicated at the class certification stage. At this juncture, the Court's inquiry is limited to the substance and structure of the underlying claims, and the Court must avoid passing judgment on the merits. *Rodney*, 146 Fed. Appx. at 785–86. *See also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 308, 311 (E.D. Mich. 2001) ("At this stage, the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts."). Considering the substance and structure of the claims, Defendants' assertions regarding loss causation are not a unique defense applicable only to certain class members, but constitute a merits issue to be addressed by the class as a whole in relation to an element of Plaintiff's § 10(b) claim.

Defendants contend that the Court must determine loss causation at this stage in order to decide if Plaintiff can rely on the fraud on the market theory to satisfy the predominance requirement. (Defs.' Mem. Opp'n 26, 28 (citing *Oscar*, 487 F.3d 261).) The Court disagrees. In *Oscar*, the Fifth Circuit held that "loss causation must be established at the class certification stage by a preponderance of all admissible evidence." *Oscar*, 487 F.3d at 269. Based on that court's desire to limit the "*in terrorem* power of certification," the Fifth Circuit refused to "withhold[] until 'trial'" what it acknowledged was "a merit inquiry." *Id.* at 267 (emphasis added). This Court agrees with the Fifth Circuit that loss causation is a merit inquiry.

This Court is bound by Sixth Circuit precedent, and leaves to the Sixth Circuit "the prerogative of overruling its own decisions." *Steele v. Indus. Dev. Bd.*, 301 F.3d 401, 408–09 (6th Cir. 2002) (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)). As discussed above, the Sixth Circuit has held clearly that courts cannot inquire into the merits at the class certification stage.

## 2.   *Superiority*

The Court also finds that a class action is the superior method for adjudicating this controversy if the four requirements of Rule 23(a) are satisfied.

"It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions." *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 427 (S.D. Fla. 1991) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985)); *Castillo*, 206 F.R.D. at 474 ("Courts have generally considered that class actions are the most favorable means of adjudicating federal securities fraud claims."); *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 374 (D. Del. 1990) (noting the "policy of favoring class actions in securities fraud cases").

As noted above, securities fraud actions are particularly well suited for class certification due to the predominance of common issues of fact and the impracticability of bringing individual actions. Moreover, meritorious private actions under federal antifraud securities law have been acknowledged as an essential supplement to criminal prosecutions and civil enforcement actions. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Basic*, 485 U.S. at 230–31; *Rospatch*, 1991 U.S. Dist. Lexis 10311 at *6.

Courts have found the superiority requirement to be satisfied where, like here, (i) many of the class members likely have suffered only small losses, making individual claims impracticable; (ii) use of the class action vehicle will achieve judicial economy, as well as

prevent inconsistent judgments; (iii) there are no other actions against defendants involving the same claims; and (iv) the court foresees no particular difficulties with adjudicating the class action. *Insituform Techs.*, 1995 U.S. Dist. LEXIS 5124 at 22–23.

Considering the vast number of class members, a class action will be the most fair and efficient way to resolve this dispute.

### C.    **The Class Definition**

Defendants contend that Plaintiff has failed to properly define the class because Plaintiff's defined class includes (a) investors who bought at times when consensus EPS was below Abercrombie's actual EPS of $0.63 per share and (b) "in-and-out" investors who cannot claim loss caused by the alleged inflation. (Defs.' Mem. Opp'n 34–35.) As explained below, these groups of investors need not be excluded from the class.

#### 1.    *Investors Who Purchased Between June 2 and July 7*

Defendants claim that proposed class members who bought between June 2 and July 7, 2005 have no cause of action because, as Defendants assert, consensus EPS at that time was below Abercrombie's actual EPS of $0.63 per share. Thus, Defendants assert, such investors cannot claim that the market was misled or that they suffered a loss caused by Abercrombie's alleged misrepresentations or omissions. (Defs.' Mem. Opp'n 34–35.)

As the Court has discussed, however, EPS is not Plaintiff's sole allegation relating to Abercrombie's artificially inflated stock price. For the reasons set forth in the typicality discussion above, Plaintiff can show injury and has standing even if it purchased its shares when consensus EPS did not exceed actual EPS. For the same reasons, other investors who purchased shares at such times should not be excluded from the class.

## 2.    *"In and Out" Investors*

Defendants also contend that investors who bought after June 2, 2005 but sold before August 16, 2005 (so-called "in and out traders") must be excluded from the class definition because "they cannot claim to have suffered a loss caused by [Abercrombie's] challenged conduct." (Defs.' Mem. Opp'n 35 (citing *Dura*, 544 U.S. at 342).) As the Supreme Court noted in *Dura*, "if . . . the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura*, 544 U.S. at 342 (holding that an inflated purchase price alone normally does not constitute or proximately cause economic loss, and requiring a plaintiff to show that the defendant's fraudulent conduct proximately caused the plaintiff's loss by, for example, alleging that the share price fell after the truth became known).

Defendants' assertions relate to damages issues, however, and do not pose a problem to the proposed class definition. As stated in the above discussion of predominance, "a plaintiff class should be certified despite conflicts over damages issues between early and late sellers of the stock." *Bovee*, 216 F.R.D. at 610 (citing *Picard*, 1996 U.S. Dist. LEXIS 16330 at *6; *Freedman*, 922 F. Supp. at 400; *Mut. Sav. Bank*, 166 F.R.D. at 384; *Welling*, 155 F.R.D. at 662). This Court further noted in *Bovee* that "[i]ndividual differences regarding the purchasing and selling of stock during the proposed class period [do] not destroy the typicality requirement," and "[a]ll purchasers of stock during a class period share a common interest in showing that the stock was unlawfully inflated." *Id.* at 611 (quoting *Fox*, 1994 WL 560994 at *4).

Plaintiff contends that its entire proposed class can prove that it experienced artificial inflation of Abercrombie's stock price. While this is not sufficient to demonstrate a loss, and each class member must show a loss as of the date of sale, this is true of every securities class action, and cannot prevent class certification. When other common issues predominate,

38

individual issues of damages are not an appropriate consideration at this stage of the litigation. Moreover, Plaintiff has shown that even "in-and-out" investors may have suffered damages due to partial disclosures of the alleged fraud during the Class Period. (Feinstein Report at ¶207 (Pl.'s Reply, Ex. A).)

## IV.    Conclusion

For the reasons stated above, the Court **GRANTS** Plaintiff's October 26, 2007 Motion for Class Certification under Fed. R. Civ. P. 23(b)(3) (Document 147). The Court hereby certifies a class of all persons who purchased or otherwise acquired the publicly traded securities of Abercrombie & Fitch Co. between June 2, 2005 through August 16, 2005 and were damaged thereby. The Court further designates City of Dearborn Heights Act of 345 Police and Fire Retirement System as Class Representative, appoints the law firm of Coughlin Stoia Geller Rudman & Robbins LLP as Lead Class Counsel, and appoints the law firm of Murray Murphy Moul + Basil LLP as Liaison Class Counsel.

**IT IS SO ORDERED.**

_____5 - 21 - 2009_____

**DATED**                                    **EDMUND A. SARGUS, JR.**
                                             **UNITED STATES DISTRICT JUDGE**